# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

LEBANON COUNTY EMPLOYEES'  )
RETIREMENT FUND and TEAMSTERS )
LOCAL 443 HEALTH SERVICES & )
INSURANCE PLAN, )
)
      Plaintiffs, )
)
      v. )     C.A. No. 2021-1118-JTL
)
STEVEN H. COLLIS, RICHARD W. )
GOCHNAUER, LON R. GREENBERG, JANE E. )
HENNEY, KATHLEEN W. HYLE, MICHAEL J. )
LONG, HENRY W. MCGEE, ORNELLA )
BARRA, D. MARK DURCAN, and CHRIS )
ZIMMERMAN, )
)
      Defendants, )
)
    and )
)
AMERISOURCEBERGEN CORPORATION, )
)
      Nominal Defendant. )
)

## OPINION

Date Submitted: September 23, 2022
Date Decided: December 15, 2022

Samuel L. Closic, Eric J. Juray, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Lee D. Rudy, Eric L. Zagar, Justin O. Reliford, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Jeroen van Kwawegen, Eric J. Riedel, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for Plaintiffs*.

Stephen C. Norman, Jennifer C. Wasson, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael S. Doluisio, Carla Graff, DECHERT LLP, Philadelphia, Pennsylvania; Matthew L. Larrabee, Hayoung Park, DECHERT LLP, New York, New York; Michael D. Blanchard, Amelia Pennington, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Counsel for Defendants*.

**LASTER, V.C.**

Nominal defendant AmerisourceBergen Corporation ("AmerisourceBergen" or the "Company") is one of three major wholesale distributors of opioid pain medication in the United States. Over the past two decades, AmerisourceBergen has found itself at the center of America's tragic opioid epidemic. In 2021, AmerisourceBergen agreed to pay over $6 billion as part of a nationwide settlement to resolve multidistrict litigation brought against the Company and the other two major opioid distributors (the "2021 Settlement"). AmerisourceBergen has incurred hundreds of millions of dollars settling other lawsuits and over $1 billion in defense costs. Those financial figures do not attempt to quantify the reputational harm that the Company has suffered, nor the damage from lost opportunities or management distraction. Those harms obviously pale in comparison to the human cost of the opioid epidemic.

The plaintiffs own stock in AmerisourceBergen. They contend that the Company's directors and officers breached their fiduciary duties by making affirmative decisions and conscious non-decisions that led ineluctably to the harm that the Company has suffered. They seek to shift the responsibility for that harm from AmerisourceBergen to the human fiduciaries that caused it to occur.

The plaintiffs advance two theories of breach. For their first claim, they rely on the proposition that corporate fiduciaries cannot consciously ignore evidence indicating that the corporation is suffering or will suffer harm. Most plainly, corporate fiduciaries cannot knowingly ignore red flags evidencing legal non-compliance. The Delaware Supreme Court recognized this theory in *Graham v. Allis-Chalmers Manufacturing Co.*, 188 A.2d 125 (Del. 1963). In his landmark decision in *In re Caremark International, Inc. Derivative*

*Litigation*, 698 A.2d 959 (Del. Ch. 1996), Chancellor Allen explained that *Allis-Chalmers* was not the only path to liability and that corporate fiduciaries also could be held liable if they knowingly failed to adopt internal information and reporting systems that were "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance." *Id.* at 970.

In *Stone v. Ritter*, 911 A.2d 362 (Del. 2006), the Delaware Supreme Court combined the holdings in *Allis-Chalmers* and *Caremark* by stating that directors could be held liable if

> [i] the directors utterly failed to implement any reporting or information system or controls; *or* [ii] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.

*Id.* at 370. Since *Stone*, some decisions have labeled the first theory a "prong-one *Caremark* claim" and the second theory a "prong-two *Caremark* claim." For those of us who have trouble keeping the two prongs straight, Chancellor McCormick has come to the rescue by referring to the second type of claim as a "Red-Flags Theory" or a "Red-Flags Claim."[1]

---

[1] *See City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at *17 (Del. Ch. June 30, 2022). Using the same functional approach, the first type of claim might be called a "Reporting-Systems Theory" or a "Reporting-Systems Claim." The plaintiffs do not advance a Reporting-Systems Claim. They contend that information reached the

2

As a distributor of opioids, AmerisourceBergen must comply with extensive regulatory frameworks imposed by federal and state law. The federal regulatory frameworks require that a distributor report any suspicious orders to the federal Drug Enforcement Agency (the "DEA"). A distributor must either not fill a suspicious order or first conduct due diligence sufficient to ensure that the order will not be diverted into improper channels.

For their Red-Flags Theory, the plaintiffs contend that the Company's officers and directors were confronted with a steady stream of red flags that took the form of subpoenas from various law enforcement officials, congressional investigations, lawsuits by state attorneys general, and a deluge of civil lawsuits. Meanwhile, as the opioid epidemic raged, the rates at which the Company reported suspicious orders remained incomprehensibly low. The plaintiffs contend that based on those red flags, the defendants knew that the Company was violating federal and state laws regarding opioid diversion and needed to implement stronger systems of oversight. Yet the Company's officers and directors consciously ignored the red flags and did not take any meaningful action until the 2021 Settlement. The complaint's allegations support an inference that the officers and directors declined to take action because they did not want to do anything that might imply that their earlier actions and policies were inadequate, and they also wanted to preserve their ability

---

management team and the directors, and that the fiduciaries consciously ignored it because they wanted to use possible fixes to the Company's order monitoring systems and oversight policies as settlement currency.

3

to use possible fixes to the Company's order monitoring systems and oversight policies as settlement currency.

For their second claim, the plaintiffs cite Chief Justice Strine's pointed admonition, made while serving on this court, that "Delaware law does not charter law breakers." *In re Massey Energy Co.*, 2011 WL 2176479, \*20 (Del. Ch. May 31, 2011). "As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law." *Id.* Chancellor McCormick has helpfully described this type of theory as a "*Massey* Theory" or a "*Massey* Claim." *See Hamrock*, 2022 WL 2387653, at \*17.

For their *Massey* Claim, the plaintiffs seek an inference that between 2010 and 2015, the Company's officers and directors took a series of actions which, when viewed together, support a pleading-stage inference that they knowingly prioritized profits over law compliance. The most telling evidence of intent was a decision in 2015, when management proposed and the directors approved a revised order monitoring program (the "Revised OMP"). AmerisourceBergen's existing order monitoring program used static criteria to flag orders of interest. The monitoring program called for AmerisourceBergen personnel to investigate the flagged orders and, if they still appeared suspicious, report them to the DEA. Under its existing program, AmerisourceBergen was already reporting suspicious orders at profoundly low rates.

Under the Revised OMP, AmerisourceBergen only would flag orders that *both* met the static criteria *and* were inconsistent with a particular customer's dynamic pattern of orders. The second trigger meant that if a pharmacy submitted an order that would be

4

flagged for investigation under the static criteria, but the order was consistent with the pharmacy's recent pattern of orders, then the new system would not flag the order for review. Management's presentation to the board included a Venn diagram which showed that the new system only would identify for investigation a sliver of the orders flagged under the old system.

With the implementation of the Revised OMP, AmerisourceBergen's already low rate of suspicious order reporting fell to microscopic levels. Between 2014 and 2015, the level of suspicious orders declined by 86%. Over the same period, AmerisourceBergen's total orders increased by 8.6%. Between 2015 and 2016, the level of suspicious orders declined by another 92%. Over the same period, AmerisourceBergen's total orders increased by another 6.7%.

Prosecutorial investigations, congressional inquiries, and civil lawsuits followed. Two congressional reports concluded that AmerisourceBergen failed to identify and address suspicious orders as required by federal law. Cities, counties, American Indian tribes, union pension funds, and the attorneys general of more than a dozen states sued the Company for contributing to the opioid epidemic. The plaintiffs maintain that in the face of these problems, the Company's officers and directors continued to pursue their illegal business strategy until the 2021 Settlement.

The defendants have moved to dismiss the plaintiffs' claims on two grounds. They argue that the plaintiffs' claims are untimely and that the plaintiffs' allegations fail to support an inference of demand futility.

5

This decision addresses the timeliness defense. When analyzing such a claim, the court assumes that the claim is valid. The crux of the defendants' argument is that even if the claim has merit, the plaintiffs have waited too long to bring it.

No Delaware court has addressed the timeliness principles that govern a Red-Flags Theory or a *Massey* Theory. The claims are similar in that they have a starting point when the wrongful conduct began, but the wrongful conduct then persists over the ensuing days, months, and years as the Company's officers and directors either continue to consciously ignore red flags (the Red-Flags Theory) or continue to employ a business plan that prioritizes profits over legal compliance (the *Massey* Theory).[2]

Both the Red-Flags Theory and the *Massey* Theory are equitable claims for breach of fiduciary duty. A court does not assess timeliness for those claims by applying the statute of limitations. A court applies the doctrine of laches, which considers two factors: (i) whether the plaintiff has sued within a reasonable time, and (ii) whether there has been any prejudice to the defendants from the amount of time that has passed.

When a plaintiff seeks money damages as a remedy for a breach of fiduciary duty, the court looks to the limitations period that would apply to an analogous claim at law. To

---

[2] For that matter, no Delaware court has addressed the timeliness principles that apply to a Reporting-Systems Theory. The claim is also similar in that it necessarily has a starting point when the wrongful conduct began, but the wrongful conduct then continues over the ensuing days, months, and years as the company's officers and directors continue to consciously fail to implement a reasonable reporting and monitoring system.

determine when the analogous limitations period would end, the court must determine when a claim accrues.

No Delaware court has addressed how to determine when a Red-Flags Claim or a *Massey* Claim accrues.[3] Delaware decisions have applied three methods to determine when claims for breach of fiduciary duty accrue. This decision calls them the discrete act method, the continuing wrong method, and the separate accrual method.

The discrete act method applies in the vast majority of cases. When a plaintiff contends that fiduciaries have breached their duties by making a specific decision that was complete when made, that decision constitutes a discrete wrongful act that causes the claim to accrue. To apply the statute of limitations, the court starts from when the decision was made, counts forward to determine when the limitations period would end, and checks whether the plaintiff filed suit within the limitations period. Tolling doctrines can extend the time for filing suit, but once a plaintiff is on inquiry notice, tolling stops, and the plaintiff must sue within a reasonable time or the claim will be barred. For a Red-Flags Claim or a *Massey* Claim, the discrete act approach dramatically constrains the stockholders' ability to sue, because an initial decision to ignore a red flag or pursue an illegal business plan often will be difficult to detect and will not have discernable consequences. But once some information about the decision reaches the public sphere, the

---

[3] Nor has any Delaware court addressed when a Reporting-Systems Claim accrues. Because of the conceptual similarities between a Reporting-Systems Theory and a Red-Flags Theory, similar considerations apply. This decision, however, only addresses the timeliness principles applicable to a Red-Flags Theory.

time for suit begins to run. Any subsequent continuation of the improper conduct is treated as the not-separately-actionable implementation of the original decision or the damages flowing from it. After the analogous limitations period had passed, the defendants can continue consciously ignoring red flags or pursuing an illegal business plan without any concern about a viable derivative claim. Such a regime would undermine Delaware's system of corporate accountability.

There are two alternatives that Delaware decisions have applied more rarely. One approach treats a series of inextricably related decisions and conscious non-decisions as a continuing wrong. Under this approach, the wrongful act is not complete, and the limitations period does not begin to run, until the continuing wrong ceases. If any portion of the wrongful act occurs within the limitations period, then the plaintiff can seek to impose liability and recover damages for the entire period covered by the continuing wrong. To apply the statute of limitations, the court determines when the wrongful conduct stopped, counts forward from that point to calculate when the limitations period ends, and checks whether the plaintiff filed suit within the limitations period. Tolling doctrines and inquiry notice are irrelevant if the plaintiff sues while the conduct is ongoing or if a portion of the conduct occurred within the limitations period, because the plaintiff can sue for the continuing wrong as a whole. Tolling doctrines and inquiry notice only come into play if the continuing wrong has ceased and the plaintiff did not file suit until after the limitations period otherwise would have run.

The other approach treats a series of related decisions and conscious non-decisions as a sequence of wrongful acts, each of which gives rise to a separate limitations period.

8

Under this approach, the plaintiff can seek to impose liability and recover damages for any portion of the wrongful conduct where the statute of limitations has not yet run, but not for wrongful conduct that occurred earlier. To apply the statute of limitations, the court determines when the plaintiff filed suit, looks back from that point over the length of the limitations period, and checks whether actionable conduct took place within that period. Tolling doctrines and inquiry notice operate in two ways. Similar to a continuing wrong, if the conduct has ceased and the limitations period otherwise would have run, then tolling doctrines can render the suit timely. Similar to a discrete wrongful act, tolling doctrines can extend the actionable period, enabling the plaintiff to recover over a longer time frame. Inquiry notice can cut off the ability of a tolling doctrine to extend the actionable period, but because the ongoing conduct is treated as a series of separate wrongs, inquiry notice does not cut off the plaintiff's ability to sue for conduct that took place within the portion of the actionable period that is unaffected by tolling doctrines.

For the Red-Flags Claim, the separate accrual approach offers a Goldilocks regime that falls in between a too-defendant-friendly discrete act approach and a too-plaintiff-friendly continuing wrong approach. As discussed at length later in this decision, the separate accrual approach best suits the gravamen of the claim and the nature of the harm, serves the twin goals of equity and efficiency, and fulfills the policy goals associated with statutes of limitations.

The separate accrual approach could apply to a *Massey* Claim as well. There are many similarities between a Red-Flags Claim and a *Massey* Claim. Arguably, however, the decision to consciously adopt an illegal business plan carries a greater level of culpability

that warrants the application of the continuing wrong doctrine. For purposes of this case, the *Massey* Claim is timely under the separate accrual approach, so this decision need not take the additional step of deciding whether the *Massey* Claim should implicate the continuing wrong doctrine. It is sufficient to treat the *Massey* Claim as raising—at a minimum—the same combination of considerations as the Red-Flags Claim and apply the separate accrual approach.

When applying the separate accrual approach within a laches framework, the court looks to when the plaintiff began vigilantly pursuing its claims. For purposes of a derivative action, that can be when a plaintiff begins seeking books and records. In this setting, the act of filing a lawsuit to enforce the books-and-records request is not required, and such a requirement would undercut this court's efforts to encourage stockholders and companies to resolve books-and-records requests without litigation.

In this case, the plaintiffs' diligent efforts to obtain books and records could support using May 21, 2019, as a starting date for the actionable period. The plaintiffs, however, are content to use October 20, 2019, so the court uses that date. Using a three-year statute of limitations, the actionable period began on October 20, 2016.

Tolling doctrines do not warrant extending the actionable period further. AmerisourceBergen issued disclosures in 2017 and in subsequent years about the quality of its anti-diversion program. Under the doctrine of fraudulent concealment, those disclosures provide a separate basis for extending the actionable period back to September 30, 2017. The actionable period already extends back to October 20, 2016, so those disclosures are immaterial to the timeliness analysis.

Equitable tolling is not available. Stockholders are entitled to rely on the competence and good faith of their fiduciaries and need not investigate or sue over the slightest indication of potential wrongdoing. But at some point, a steady stream of lawsuits, investigations, and other problems will put stockholders on inquiry notice, and they must take action.

In December 2014, a stockholder represented by an entrepreneurial law firm served a books-and-records request on the Company and obtained internal documents. In December 2015, the law firm sent a litigation demand asking the defendants to sue themselves on claims that anticipate the far-better-developed claims that have been asserted in the complaint. Even acknowledging that the demands were sent by a frequent and fast filing firm that was prospecting for a lawsuit, the letters show that stockholders had enough information to be on inquiry notice by December 2015. The plaintiffs needed to start pursuing their claims within a reasonable time after 2015. They did not seek books and records until 2019 and did not sue until 2022.

Because of inquiry notice, the plaintiffs cannot rely on equitable tolling to extend the actionable period to a date earlier than October 20, 2016. They can still sue for conduct and consequences that took place after October 20, 2016, because under the separate accrual approach, the defendants' ongoing refusal to respond to red flags and their persistent pursuit of an illegal business plan continued after October 20, 2016, giving rise to newly accruing wrongs.

Having reached these holdings, it becomes relatively easy to conclude that wrongful conduct occurred within the actionable period. The defendants' conduct continued until

11

AmerisourceBergen entered into the 2021 Settlement. The defendants have argued that their conduct was not actionable, but that is a different basis for dismissal than a timeliness defense.

It bears emphasizing that a starting date of October 20, 2016 for the actionable period does not mean that evidence from earlier periods is irrelevant. To determine whether the Company's business plan during the actionable period wrongfully prioritized profit over law compliance, the court must determine what business plan the officers and directors were pursuing. Answering that question requires an understanding of the state of affairs leading up to the actionable period. Likewise, to evaluate whether officers and directors acted in bad faith by ignoring red flags during the actionable period, the court must understand what they knew and understood when they made those decisions, which can take into account matters pre-dating the actionable period. For both claims, however, liability must turn on what the officers and directors did during the actionable period, and damages are limited to harms that the Company suffered during the actionable period.

The defendants' motion to dismiss the complaint as untimely is therefore denied.

## I.     FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents that the complaint incorporated by reference. Before filing this lawsuit, the plaintiffs spent two years litigating a books-and-records action in which AmerisourceBergen raised a host of defenses, including arguments that sought to defend preemptively against the merits of an eventual derivative action. The plaintiffs prevailed at the trial level and on appeal. *See Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp. (220 Decision)*, 2020 WL 132752

12

(Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020). After that hard-fought and resource-intensive victory, the plaintiffs obtained books and records under the terms of a confidentiality order which provided that if the plaintiffs relied on the documents in a future action, then all of the documents "will be deemed incorporated by reference in any complaint subject to the conditions set forth in *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752 (Del. Ch. 2016), subject to Delaware law." C.A. No. 2019-0527-JTL, Dkt. 64 ¶ 9 (Del. Ch. May 8, 2020).

Relying on the incorporation-by-reference condition, the defendants submitted sixty-one exhibits in support of their opening brief, plus another seven exhibits in support of their reply brief. The defendants ask the court to consider the sixty-eight exhibits when evaluating the complaint's allegations.[4]

The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one.[5] The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document.

---

[4] Citations in the form "Ex. — at —" refer to exhibits that the defendants submitted. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number. Citations in the form "Compl. ¶ ___" refer to the paragraphs of the complaint.

[5] *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 & n.17 (Del. Ch. Feb. 21, 2014).

But the doctrine does not change the pleading standard that governs a motion to dismiss. If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiffs made a well-pled factual allegation, then the court must credit the allegation. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The plaintiffs also remain entitled to "all reasonable inferences." *Id.* at 897. Consequently, if a document supports more than one possible inference, and if the inference that the plaintiffs seek is reasonable, then the plaintiffs receive the inference. *Id.*

At this stage of the proceeding, the well-pled allegations of the complaint are deemed to be true. The plaintiffs are entitled to all reasonable inferences that the well-pled allegations support. To the extent that factual allegations or documents incorporated by reference support competing inferences, the plaintiffs are entitled at this stage to the inference that favors their claims.

The factual background for this decision emphasizes matters pertinent to the timeliness analysis. It de-emphasizes matters pertinent to the defendants' alternative contention that demand is not futile because the plaintiffs' claims do not pose a substantial threat of liability to at least half of the directors in office when the lawsuit was filed.

## A. AmerisourceBergen And Its Legal Obligations As An Opioid Distributor

Nominal defendant AmerisourceBergen is one of the largest distributors of pharmaceutical products in the world.[6] It is a Delaware corporation, headquartered in

---

[6] The Company conducts its pharmaceutical distribution business through two subsidiaries: AmerisourceBergen Drug Corporation (the "Drug Company") and AmerisourceBergen Specialty Group, LLC (the "Specialty Group"). The Drug Company

14

Pennsylvania, whose shares trade on the New York Stock Exchange under the ticker symbol "ABC."

In the United States, AmerisourceBergen is one of the "Big Three" wholesale distributors of pharmaceutical products. The other two are Cardinal Health, Inc. and McKesson Corporation. AmerisourceBergen and McKesson each control approximately one-third of the domestic pharmaceutical distribution market. Cardinal Health controls another fifth.

As an opioid distributor, AmerisourceBergen acts as a middleman between the companies who manufacture opioids and the pharmacies that fill prescriptions for opioids. In its role as a distributor, AmerisourceBergen must comply with the Comprehensive Drug Abuse Prevention and Control Act of 1970 and its implementing regulations. To obtain and maintain a license to distribute opioids, a Company must maintain "effective controls against diversion of [opioids] into other than legitimate medical, scientific, research, and industrial channels." 21 U.S.C. § 823(b)(1). A distributor must also "design and operate a system to disclose to the registrant suspicious orders of [opioids]." 21 C.F.R. § 1301.74(b).

---

distributes healthcare products and supplies, including opioids, and provides pharmacy management and other consulting services to institutional healthcare providers such as hospitals and retail pharmacies. The Specialty Group serves the specialty pharmaceuticals market, focusing on products involving biotechnology, blood plasma, and oncology. The Specialty Group also provides pharmaceutical distribution and related services to physicians and institutional healthcare providers. While important for many reasons, the distinctions between AmerisourceBergen and its subsidiaries are not relevant to this decision, which refers only to AmerisourceBergen.

"Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

A distributor must report suspicious orders to the DEA. Once a distributor has reported a suspicious order, it must either (i) decline to ship the order or (ii) ship the order only after conducting due diligence and determining that the order is not likely to be diverted into illegal channels. *See Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212–13 (D.C. Cir. 2017). The DEA can suspend or revoke the license of any distributor that fails to maintain controls or respond appropriately to suspicious orders. *See* 21 U.S.C. § 824.

## B.     The Ongoing Opioid Crisis

The United States remains mired in an opioid crisis that has spanned more than two decades, killed hundreds of thousands of Americans, and affected the lives of millions more. In the late 1990s, the pharmaceutical industry pushed to increase the use of prescription opioids to treat pain management. Manufacturers created new formulations of extended-release opioids, which they marketed as non-addictive and superior to existing methods of pain management. Doctors responded by writing more prescriptions for opioids, often without appreciating or advising patients about the risk of addiction. *See 220 Decision*, 2020 WL 132752, at *2.

Between 1999 and 2014, the sale of prescription opioids in the United States practically quadrupled. The medications proved far more addictive and dangerous than the pharmaceutical industry had led the nation to believe, and the expanded use of the medications led to widespread misuse. As many as 29% of the patients who were

16

prescribed opioids for chronic pain misused them, and as many as 12% developed an opioid-use disorder. *Id*

The increased levels of opioid abuse had tragic consequences. The Centers for Disease Control and Prevention reported that there were nearly 218,000 overdose deaths related to prescription opioids between 1999 and 2017. Between 2000 and 2015, the rate of opioid overdose deaths in the United States more than tripled. The number of opioid-related deaths reached 69,710 in 2020, and opioid overdoses comprised the vast majority of drug overdoses in the country.

To help fight the epidemic, the DEA increased its scrutiny of distributors like AmerisourceBergen in an attempt to have them fulfill their legal obligations to identify suspicious orders and prevent diversion. The Big Three supply drugs to pharmacies using "just-in-time" delivery. That means that most pharmacies receive drug deliveries every day and sometimes multiple times a day. Because deliveries are so frequent, distributors know exactly how many individual opioid pills they are delivering to each pharmacy. Distributors like AmerisourceBergen are thus uniquely positioned to assess whether a pharmacy is facilitating the diversion of prescription opioids.

## C.     AmerisourceBergen's Initial Run-Ins With The DEA

In April 2007, the DEA suspended AmerisourceBergen's license for a distribution center in Orlando, Florida, because of involvement with suspicious orders of opioids. The DEA found that the Orlando center had sold over 5.2 million dosage units of opioids to pharmacies that AmerisourceBergen knew, or should have known, were diverting the opioids into improper channels. The DEA found that the pharmacies in question (i) ordered

17

opioids in amounts that far exceeded what an average pharmacy orders, (ii) ordered small amounts of other drug products relative to the pharmacies' opioid purchases, (iii) ordered opioids much more frequently than other pharmacy customers, and (iv) were publicly known to fill prescriptions written by physicians acting outside the usual course of professional practice. The DEA concluded that AmerisourceBergen had failed to maintain effective controls against diversion.

In June 2007, AmerisourceBergen settled with the DEA (the "2007 Settlement"). As part of the settlement, AmerisourceBergen committed to implement a more sophisticated order monitoring program designed to detect and prevent diversion of controlled substances (the "2007 OMP"). In August, in reliance on the implementation of the 2007 OMP, the DEA reinstated the license for the Orlando center.

That same year, AmerisourceBergen acquired Bellco Drug Company ("Bellco"), another drug distributor. In June 2007, between signing and closing, Bellco entered into a consent decree with the DEA for failing to report suspicious orders of controlled substances. Bellco paid an $800,000 fine and surrendered its DEA license.

After these events, AmerisourceBergen developed and implemented the 2007 OMP. When doing so, the Company consulted with the DEA to establish what at the time constituted the industry-standard compliance program.

AmerisourceBergen described the 2007 Settlement and the Bellco settlement in its annual reports on Form 10-K for the years 2007, 2008, 2009, 2010, and 2011.

**D.      The Independent Pharmacy Strategy**

During 2010, management embarked on a plan to extract maximum value from the independent pharmacy market (the "Independent Pharmacy Strategy"). Independent pharmacies offered a potentially significant source of revenue because they had significantly less market power than chain pharmacies and could not bargain as effectively for lower prices. Their smaller size also meant that they had fewer resources to devote to monitoring suspicious orders and could more easily become pill mills.

In 2011, management continued to pursue the Independent Pharmacy Strategy. Management hired McKinsey & Co. to help make the AmerisourceBergen sales force more effective and focused on expanding its independent pharmacy business in New York. Sales to independent pharmacies increased by 11.7% between July 2010 and March 2011.

During this same period, AmerisourceBergen's commitment to diversion control began to ebb. At the time, Chris Zimmerman held the position of Vice President of Corporate Securities and Regulatory Affairs ("Regulatory Affairs"), where he was in charge of diversion control. On April 22, 2011, he sent an email to the five senior members of the diversion control team that contained a set of lyrics for a song titled "Pillbillies," a parody of *The Beverly Hillbillies* theme song. The parody described opioid addicts visiting Florida "Pain Clinics" to buy "Hillbilly Heroin." Another email that circulated among the senior compliance staff included the lyrics for the song "OxyContinVille," a parody of Jimmy Buffet's "Margaritaville." It described addicts driving from Kentucky to Florida "[l]ookin' for pill mills." On May 6, 2011, Zimmerman emailed the leadership team for diversion control about recently enacted Florida legislation that was designed to crack

19

down on pill mills. He offered the following prediction: "Watch out Georgia and Alabama, there will be a max [sic] exodus of Pillbillies heading north."

In March 2012, Zimmerman was promoted to the positions of Chief Compliance Officer and Senior Vice President in charge of Corporate Securities and Regulatory Affairs, a position he held until October 2018. During that period, Zimmerman and his division were responsible for overseeing the order monitoring program and anti-diversion efforts, and Zimmerman personally was responsible for bringing issues to the attention of the Audit Committee. Zimmerman's communications with his team support an inference that he was not a suitable individual to hold these important positions, and his callous and scornful disregard for the victims of the opioid crisis supports an inference that AmerisourceBergen lacked a culture of compliance.

Also in March 2012, the board learned that the DEA had suspended Cardinal Health's license to distribute controlled substances from a distribution facility in Lakeland, Florida. The basis for the suspension was Cardinal Health's dealings with four independent retail pharmacies.

In the face of the DEA's enforcement actions, management and the board doubled down on the Independent Pharmacy Strategy. Management and the board discussed ways to expand the independent pharmacy business by offering a "[s]uite of offerings to reduce churn and increase profitability," including "a 'light touch' franchise model" and "'friendly landings' for [AmerisourceBergen] independent pharmacists looking to transfer ownership." Compl. ¶ 119. The light touch franchise model meant easy onboarding for new

independent pharmacies and minimal compliance-related diligence by AmerisourceBergen.

Two months later, in May 2012, management reported to the Audit Committee that the Company had received subpoenas from the DEA and the United States Attorney's Office for the District of New Jersey that sought documents concerning the Company's anti-diversion programs. In June 2012, the Attorney General of West Virginia named AmerisourceBergen as a defendant in a lawsuit that alleged violations of state law related to the distribution of opioids.

In November 2012, the Audit Committee received a report on the Company's regulatory compliance efforts, including anti-diversion controls. The report informed the committee members that AmerisourceBergen's levels of suspicious order reporting were extremely low:

| AmerisourceBergen Averaged 215,000,000 Line Orders from 2009-2012 | |
|---|---|
| | Suspicious Orders Reported |
| 2009 | 0.000864% [1,858] |
| 2010 | 0.001085% [2,322] |
| 2011 | 0.001870% [4,020] |
| 2012 | 0.002564% [5,512] |

*Id.* ¶ 129. The committee also learned that the Company was expending far fewer resources on compliance than peer companies. Its staff of fourteen internal audit personnel was less than one-third the average of forty-six internal audit staff at other Fortune 500 companies.

AmerisourceBergen's internal audit expenditure of $1.85 million was similarly well below the $7.1 million average at other Fortune 500 companies.

The Company's quarterly report on Form 10-Q for the quarter ending December 31, 2012, disclosed the subpoena from the United States Attorney's Office for the District of New Jersey and the lawsuit filed by the Attorney General of West Virginia. Similar disclosures appeared in the Company's Form 10-Q for the period ending March 30, 2013.

## E.  The Walgreens Alliance

During 2013, management sought to increase the Company's sales through an alliance with Walgreens. By taking on a distribution relationship with Walgreens, AmerisourceBergen added more than 8,000 retail pharmacies to its portfolio. AmerisourceBergen estimated that the alliance would increase its orders for controlled substances by 213%.

By increasing order flow, the alliance increased AmerisourceBergen's risk of suspicious orders. Not only that, but Walgreens was already having problems with the DEA. In June 2013, Walgreens agreed to pay an $80 million fine to the DEA for negligently allowing opioids to be diverted for misuse.

With the Company expecting to double its orders, management advised the board that the Diversion Control Group in Regulatory Affairs would increase from just five employees to seven. The Investigations Group would increase from only four employees to six. The resources associated with diversion thus would not keep pace with anticipated growth. In real-world terms, the per-order level of resources was reduced.

22

## F.     Increasing Regulatory Scrutiny

As 2013 wore on, the regulatory and enforcement environment intensified. In September 2013, management advised the board that there was an "increasing focus in [sic] [controlled substances] sales and [order monitoring programs] in US." *Id.* ¶ 148. In November 2013, the board received an update on subpoenas issued by the DEA and multiple United States Attorneys' Offices.

The Company's Form 10-K for the fiscal year ending September 30, 2013, disclosed the complaint filed by the Attorney General of West Virginia, the subpoenas issued by the United States Attorney for the District of New Jersey, and additional subpoenas issued by the United States Attorneys for the Districts of Kansas and the Northern District of Ohio. The Company's Form 10-Q for the period ending December 31, 2013, contained similar disclosures.

Throughout 2014, the directors received reports on the ongoing investigations into the Company. During its meeting in October 2014, the Audit Committee learned that the United States Attorneys' Office for the District of New Jersey had subpoenaed the Company's outside auditor as part of a pending grand jury investigation involving the Company.

During 2014, the Company's public filings continued to contain disclosures regarding the investigations being conducted by the United States Attorneys' Offices and the lawsuit filed by the Attorney General of West Virginia.

**G.      The Revised OMP**

In 2015, against a backdrop of increasing legal scrutiny and already low levels of suspicious order reporting, management and the board implemented the Revised OMP. The plaintiffs contend that the Revised OMP was plainly intended to reduce the number of suspicious orders that the Company would report to the DEA. The plaintiffs assert that, when viewed in conjunction with the Company's efforts to expand its opioid distribution business through measures like the Independent Pharmacy Strategy and the Walgreens alliance, and in the context of intensifying regulatory scrutiny, the adoption of the Revised OMP evidences a knowing breach of fiduciary duty in which the directors prioritized profits over compliance.

In March 2015, Zimmerman and David May, the Director of Diversion Control and Federal Investigations, gave a presentation to the Audit Committee about the Revised OMP. The Company was still using the 2007 OMP, which flagged orders using static thresholds. The Revised OMP added a second test that compared an individual order's size against "[d]ynamic thresholds refreshed annually based upon actual consumption data over the most recent 12-month period." *Id.* ¶ 166. It thus added an additional trigger that would fail only if a current order was inconsistent with the customer's recent pattern of orders. Ultimately, both tests needed to fail for an order to be marked as suspicious.

As depicted in a Venn diagram presented to the Audit Committee, the double-trigger Revised OMP would inevitably result in only a portion of orders flagged for investigation:

24



CONFIDENTIAL INSPECTION MATERIAL

LEBANON_010776

Ex. 39 at 9. The Audit Committee reported on this presentation to the full board the next day. After the board meeting, the Revised OMP went into effect. Dkt. 28 at 3–5.

Between 2014 and 2015, the level of suspicious orders that AmerisourceBergen reported to the DEA declined by 86%, dropping from 14,003 to 1,892. Over the same period, AmerisourceBergen's total orders increased by 8.6%, from 20,777,594 to 22,560,562.

Between 2015 and 2016, the level of suspicious orders that AmerisourceBergen reported to the DEA declined by another 92%, dropping from 1,892 to 139. Over the same

period, AmerisourceBergen's total orders increased by 6.7%, from 22,560,562 to 24,067,791.

The following table shows the impact of the Revised OMP.

| Percentage of Orders Flagged and Reported to the DEA | | | | |
|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** |
| **Orders Placed** | 13,580,197 | 20,777,594 | 22,560,562 | 24,067,791 |
| **Orders of Interest** | 60,499 | 78,707 | 83,407 | 48,888 |
| **Orders Reported** | 24,103 | 14,003 | 1,892 | 139 |
| **Percent of All Orders Flagged (derived)** | 0.445% | 0.379% | 0.370% | 0.203% |
| **Percent of All Orders Reported (derived)** | 0.177% | 0.067% | 0.008% | 0.0006% |

The Revised OMP was not the only problem with the Company's order monitoring system. In August 2015, AmerisourceBergen engaged FTI Consulting, Inc. to conduct a review of how AmerisourceBergen went about investigating orders of interest. FTI identified a series of deficiencies, including a lack of resources, lack of formal training, inconsistent policies, and communication breakdowns. The report identified the Company's regulatory obligations related to diversion control as one of the "Gaps & Risks" that needed to be addressed.

## H.     The Stockholder Litigation Demand

On December 1, 2015, the law firm of Scott + Scott LLP sent a litigation demand to the board on behalf of a stockholder named James Hays that asked the directors to bring

26

claims against themselves for breaches of fiduciary duty in connection with their failure to oversee the Company's diversion control and order monitoring systems. Ex. 55 at 5–6.

The Audit Committee retained Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") to evaluate the demand and make a recommendation regarding whether the Company should pursue litigation against its directors. On August 4, 2016, Fried Frank presented its report and recommendations to the board. Fried Frank recommended against pursuing any claims, and the board adopted that recommendation. *See* Ex. 56.

Except for reviewing the litigation demand, the board did not take any steps in 2016 to evaluate the Revised OMP. Government investigators subsequently asserted that AmerisourceBergen's systems could be manipulated easily to avoid flagging orders as suspicious and that AmerisourceBergen was not conducting adequate diligence into customer orders.

As noted, AmerisourceBergen reported only 139 orders in 2016. Despite shipping millions of opioid pills into West Virginia in 2016, AmerisourceBergen reported only three suspicious orders for all of the pharmacies in West Virginia.

## I.     2017: More Red Flags

In 2017, AmerisourceBergen's officers and directors were confronted with a steady stream of red flags. In January 2017, the Audit Committee was informed that AmerisourceBergen had entered into a $16 million settlement with the State of West Virginia to resolve claims regarding opioid distribution. The Audit Committee was advised that other West Virginia County Commissions and cities had filed similar complaints.

27

In May 2017, the Energy and Commerce Committee of the United States House of Representatives (the "House Committee") opened a bipartisan investigation into large opioid shipments to small-town pharmacies in West Virginia. Two months later, United States Senator Claire McCaskill of Missouri, then the Ranking Member of the Senate Committee on Homeland Security and Governmental Affairs, requested documents and information related to AmerisourceBergen's anti-diversion efforts.

AmerisourceBergen's order reporting statistics for 2017 resembled its numbers for 2015 and 2016. AmerisourceBergen received 24,319,706 opioid orders. The Company flagged 87,224 for examination, representing a rate of 0.359%. The Company determined that only 176 orders were actually suspicious, reflecting a rate of 0.0007% of total orders and 0.2% of flagged orders.

During 2017, a consortium of attorneys general from forty-one states requested documents and information from AmerisourceBergen and other opioid distributors as part of an investigation into their distribution practices. *See 220 Decision*, 2020 WL 132752, at *3.

In its annual report on Form 10-K for the fiscal year ending September 30, 2017, AmerisourceBergen represented to stockholders that its diversion controls were sound. The annual report stated:

> [W]e are deeply committed to diversion control efforts, have sophisticated systems in place to identify orders placed warranting further review to determine if they are suspicious (including through the use of data analytics), and engage in significant due diligence and ongoing monitoring of customers.

Compl. ¶ 295.

28

## J.    2018: More Red Flags

In January 2018, after AmerisourceBergen failed to respond to a records request, the State of Delaware filed a complaint alleging that AmerisourceBergen "routinely and continuously violated [Delaware] laws and regulations" concerning the distribution of opioids. *Id.* ¶ 250. In February, the Cherokee Nation filed a complaint against AmerisourceBergen for having fueled the opioid crisis in Oklahoma. By this point, AmerisourceBergen faced 840 cases in state and federal courts, as well as investigations by the Department of Justice and by United States Attorneys' Offices in New Jersey, New York, Colorado, and West Virginia.

Management staunchly defended the Company's practices. When testifying in May 2018, before the House Committee, the Company's Chairman, President, and CEO, Steven Collis, denied that AmerisourceBergen had contributed to the nation's opioid epidemic and maintained that the Company's order management program was fully compliant with law.

Two months later, in July 2018, Senator McCaskill published a report titled *Fueling an Epidemic, Report Three: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement*. The Senate report concluded that AmerisourceBergen, McKesson, and Cardinal Health consistently failed to meet their reporting obligations regarding suspicious orders. The report observed that AmerisourceBergen was the most egregious of the three and reported suspicious orders far less frequently than its competitors. Between 2012 and 2017, AmerisourceBergen shipped approximately 650 million dosage units to Missouri customers and reported only 224 orders as suspicious. McKesson reported seventy-five times more suspicious orders on

29

similar order volumes. Cardinal Health reported twenty-three times as many orders on half the volume.

In August 2018, Zimmerman gave a deposition in which he testified that although he met with the Audit Committee quarterly, he did not regularly provide updates on diversion controls. He also admitted that his department did not perform periodic, unexpected audits of the Company's independent pharmacy customers, even the easily identifiable and relatively small groups of pharmacies that consistently ordered the highest volumes of opioids.

In December 2018, the House Committee released a report titled *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia*. The report found that AmerisourceBergen, McKesson, and Cardinal Health failed to address suspicious order monitoring in West Virginia. It concluded that after the 2007 Settlement with the DEA, AmerisourceBergen initially identified and halted suspicious orders from West Virginia, but that beginning in 2013, AmerisourceBergen's reporting of suspicious orders declined significantly from a high of 792 orders in 2013 to a low of only three orders in 2016. The report inferred that the trend for AmerisourceBergen's reporting of suspicious orders in West Virginia reflected a broader nationwide decline, because on a per-capita basis, West Virginia had the second-highest number of suspicious orders reported to the DEA by AmerisourceBergen of all states. Stated differently, in other states AmerisourceBergen was reporting *fewer* suspicious orders on a per-capita basis. *See* Majority Staff of H. Comm. on Energy & Com., *Red Flags and Warning Signs Ignored:*

30

*Opioid Distribution and Enforcement Concerns in West Virginia* 16, 250–55 (Comm. Print 2018).

The House Committee report concluded that AmerisourceBergen was worse than its competitors when it came to reporting suspicious orders to the DEA. Between 2007 and 2017, McKesson reported more than 10,000 suspicious orders for West Virginia customers. AmerisourceBergen only reported 2,000 suspicious orders during the same period. *Id.* at 16.

The House Committee report provided examples of how the Independent Pharmacy Strategy and the "light touch" approach operated in practice. For example, in 2011, AmerisourceBergen approved Westside Pharmacy as a new customer even though two of the six prescribing "Pain Doctors" were located substantial distances away from the pharmacy. AmerisourceBergen did not conduct any investigation into why those doctors were using Westside Pharmacy to fill their prescriptions. AmerisourceBergen stopped supplying Westside Pharmacy with opioids in 2012, then approved a new customer application for Westside Pharmacy in January 2016, without considering the pharmacy's prior history with the Company. AmerisourceBergen also did not consult public news reports that contained red flags about the prescribing physicians. *Id.* at 19–20.

AmerisourceBergen's order reporting statistics for 2018 resembled its numbers for 2015, 2016, and 2017. AmerisourceBergen received 26,520,195 opioid orders. The Company flagged 75,431 for examination, representing a rate of 0.284%. The Company determined that only 489 orders were actually suspicious, reflecting a rate of 0.0018% of total orders and 0.6% of flagged orders.

In its annual report on Form 10-K for the fiscal year ending September 30, 2018, AmerisourceBergen repeated its disclosure regarding the quality of its diversion control program.

**K.    2019: Still More Red Flags**

In February 2019, the board received a report detailing over 1,600 federal cases that had been consolidated in a multidistrict litigation before the Northern District of Ohio (the "Opioid MDL"), numerous cases pending in state courts, an investigation being undertaken by a coalition of state attorneys general, and subpoenas from numerous United States Attorneys' offices. The Attorney General for the State of Florida had filed suit in November 2018, and the Attorney General for the State of Georgia had filed suit in January 2019. The directors also were informed that the United States Attorney's Office in the District of New Jersey was opening a criminal investigation into the Company.

The Company's report on Form 10-Q for the quarter ending January 30, 2019, included disclosures regarding the litigation facing the Company. It noted that AmerisourceBergen was engaged in settlement discussions with the United States Attorney for the District of New Jersey and stated:

> [T]he Company continued to receive additional subpoenas from the USAO-NJ that expanded the scope of the previous subpoenas, asking about the Company's programs from 2013 through the present. Due to this increase in scope, any previous monetary offers made by the Company are suspended and any settlement discussions are now preliminary and incomplete. The Company has concluded, and we concur, that a loss in this matter is reasonably possible in accordance with ASC 450-20, Contingencies- Loss Contingences; however, the Company is unable to reasonably estimate a range of possible loss.

Compl. ¶ 256 (formatting omitted).

In March 2019, the Attorney General for the State of Washington filed suit. The Attorney General for the State of New York filed its own action that same month.

In May 2019, the plaintiffs served a demand for books and records on AmerisourceBergen. The plaintiffs explained that they sought to investigate whether the Company's directors and officers had committed mismanagement or breached their fiduciary duties in connection with the distribution of opioids, and they described AmerisourceBergen's role in the opioid crisis and the avalanche of legal issues facing the Company. Astoundingly, AmerisourceBergen rejected the demand in its entirety, contending that the demand did not state a proper purpose or provide a credible basis to suspect wrongdoing. Over the next two years, the plaintiffs pursued their books-and-records action, prevailing first before this court and then on appeal. *See AmerisourceBergen Corp. v. Lebanon Cnty. Empls.' Ret. Fund*, 243 A.3d 417, 422 (Del. 2020) (affirming *220 Decision*).

On October 21, 2019, on the eve of trial for one of the bellwether cases in the Opioid MDL, AmerisourceBergen, McKesson, and Cardinal Health settled for a payment of $215 million.

During 2019, more plaintiffs brought claims against the Company. Cabell County and the City of Huntington in West Virginia filed a joint complaint against AmerisourceBergen and other major opioid distributors. The State of Tennessee and the State of Michigan also filed lawsuits.

AmerisourceBergen's order reporting statistics for 2019 resembled its numbers for 2015, 2016, 2017, and 2018, albeit with slight increases in the numbers of orders flagged

and reported. AmerisourceBergen received 27,030,389 opioid orders. The Company flagged 66,009 for examination, representing a rate of 0.244%. The Company determined that only 1,091 orders were actually suspicious, reflecting a rate of 0.004% of total orders and 1.6% of flagged orders.

In its annual report on Form 10-K for the fiscal year ending September 30, 2019, AmerisourceBergen repeated its disclosure regarding the quality of its diversion control program.

**L.      2021: The Settlements**

In 2020, AmerisourceBergen continued to face an onslaught of additional opioid litigation. AmerisourceBergen's annual report on Form 10-K for the fiscal year ending September 30, 2020, again reassured stockholders about the quality of its diversion control program.

In the summer of 2021, AmerisourceBergen, McKesson, and Cardinal Health faced two significant trials, one in West Virginia and one in New York. Before the New York trial concluded, the defendants offered a global settlement worth $21 billion to resolve all claims by the states and localities.

On July 20, 2021, AmerisourceBergen, Cardinal Health, McKesson, and Johnson & Johnson agreed to settle the New York action for $1.18 billion. They simultaneously reached an agreement with various other states and localities on a global settlement involving a payment of $26 billion (the "2021 Settlement"). AmerisourceBergen agreed to pay approximately $6.4 billion over eighteen years.

As part of the 2021 Settlement, AmerisourceBergen agreed to permanent injunctive relief designed to remedy deficiencies in the Revised OMP and require direct board oversight of the program. Among other things, AmerisourceBergen agreed to improve its monitoring of customer red flags, conduct more thorough due diligence investigations, and use model-based thresholds in a manner that actually identifies and stops suspicious orders. In addition, AmerisourceBergen agreed to establish the position of Chief Diversion Control Officer and form a management-level committee that would report regularly to the board on anti-diversion efforts. AmerisourceBergen also agreed to create a board-level Compliance Committee to directly oversee the new order management program. Dkt. 28 at 35.

In return for this package of relief, AmerisourceBergen and the individual defendants received expansive releases from liability. The plaintiffs view the corporate governance measures as steps that the defendants could and should have taken years before, but which they saved to use as settlement currency. *Id.* at 35 n.118.

As of January 2021, anticipated opioid settlements had caused the Company to suffer an operating loss of $5.135 billion (approximately $16.65 per share). Despite the massive harm to AmerisourceBergen, the directors approved a raise of $14.3 million for Collis as CEO, reflecting an increase of 26%. *Id.* at 35–36.

## II.     LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Rule 12(b)(6) on the grounds that it fails to state a claim on which relief can be granted. The defendants maintain that the plaintiffs cannot state a claim for relief because their lawsuit is untimely.

35

When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

For a court to grant a Rule 12(b)(6) motion on timeliness grounds, the complaint's allegations must show that the claim was filed too late. *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993) (Allen, C.). When asserting a timeliness defense, a defendant argues that even if the claims are viable, the plaintiff cannot assert them, so the court effectively assumes the validity of the claims, then applies timeliness principles. When evaluating whether the factual allegations in a complaint support a timeliness defense, a court "must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis." *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524–25 (Del. Ch. 2005).[7]

---

[7] The *Pettinaro* decision asserts that "[t]his plaintiff-friendly stance does not govern assertion of tolling exceptions to the operation of a statute of limitations (or the running of the analogous period for purposes of a laches analysis), however. A plaintiff asserting a tolling exception must plead facts supporting the applicability of that exception." *Id.* (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE) ("[T]he party asserting that tolling applies . . . bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.")). As the quotation from the *Dean Witter* decision shows, that case supports the proposition that a plaintiff has the burden to allege facts at the pleading stage that support the application of a tolling doctrine. Other authorities say the same thing. *E.g.*, *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *14 (Del. Ch. Nov. 21, 1995) (Allen, C.) ("Plaintiff has the burden of pleading facts that will qualify the case for the tolling principle."); *In re USACAFES, L.P. Litig.*, 1993 WL 18769, at *3 (Del. Ch.

The plaintiffs advance a Red-Flags Claim and a *Massey* Claim. No Delaware

decision has addressed how to apply timeliness principles to either type of claim. The

defendants argue for applying the same timeliness principles that would govern any breach

of fiduciary duty claim involving an easily identifiable and singular decision. The

defendants then apply a three-year statute of limitations, treating the Red-Flags Theory and

*Massey* Theory as if they were claims at law.

---

Jan. 21, 1993) ("[W]here, as here, plaintiff's pleading shows on its face that if the applicable statute were applied, the claim asserted would be time-barred, then it is plaintiff's burden to plead facts which could support a conclusion that, in the circumstances, the running of the statute was tolled."). The authorities do not support the assertion that once a plaintiff has pled facts that could support the application of a tolling doctrine, the plaintiff does not receive the benefit of pleading-stage inferences that would support the tolling doctrine's application. Nor does the *Pettinaro* decision explain why the Rule 12(b)(6) standard would not govern in that instance. Subsequent decisions have repeated *Pettinaro*'s statement about Rule 12(b)(6)'s inapplicability, without investigation. *See, e.g.*, *Matter of Est. of du Pont Dean*, 2017 WL 3189552, at \*4 (Del. Ch. July 13, 2017); *Eni Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at \*11 (Del. Ch. Nov. 27, 2013).

The real difference seems to be between Delaware's fact-based version of notice pleading under Rule 8 and the heightened requirement of particularized pleading under Rule 9. Consistent with how Delaware applies Rule 8, a plaintiff must plead facts supporting an inference that tolling applies. If the plaintiff invokes fraudulent concealment, then the plaintiff must plead particularized facts in compliance with Rule 9. If there are competing inferences to be drawn from those facts, then the plaintiff gets the benefit of the inference at the pleading stage. That is what Rule 12(b)(6) contemplates, and that is how the rule generally operates on other issues where the plaintiff has the burden, such as on the issue of proving an element of a pled claim. *See, e.g.*, *In re Am. Int'l Gp., Inc. Consol. Deriv. Litig.*, 965 A.2d 763, 805–06 (Del. Ch. 2009) ("But, even though fraud must be stated with particularity, this is still a motion to dismiss, and the Stockholder Plaintiffs are entitled to have me draw all reasonable inferences in their favor."), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

The proper framework for evaluating the timeliness of the Red-Flags Theory and *Massey* Theory is the doctrine of laches. When examined within the laches framework, neither of the plaintiffs' claims is untimely. The defendants' Rule 12(b)(6) motion is therefore denied.

## A. The Framework For Analyzing Timeliness

There are two conceptual frameworks for analyzing timeliness: the statute of limitations and the doctrine of laches. *See Whittington v. Dragon Gp.*, *L.L.C.*, 991 A.2d 1, 7 (Del. 2009) ("Both the doctrine of laches and statutes of limitations function as time bars to lawsuits."). Depending on the nature of the claim and the relief requested, a court of equity may apply either doctrine.

When a plaintiff has advanced a legal claim and seeks a form of relief that is available from a court at law, such as monetary damages, then the court will apply the statute of limitations in the same manner as a law court. *Perkins v. Cartmell*, 1845 WL 493 at *5 (Del. June 1845). Otherwise, a plaintiff could "be placed in a potentially better position to seek to avoid a statute of limitations than if she had filed in a Delaware court of law by invoking the more flexible doctrine of laches." *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 976 (Del. Ch. 2016). For a legal claim seeking legal relief, a plaintiff should not be able to end run the statute of limitations by finding a basis for jurisdiction in chancery. *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *5 (Del. Ch. Nov. 2, 2017), *aff'd*, 2019 WL 244619 (Del. Jan. 17, 2019) (TABLE).

If a plaintiff has presented a court of equity with an equitable claim or if the plaintiff has sought equitable relief, then the court will apply the doctrine of laches. 2 Donald J.

38

Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.07[d] at 15-88 (2d ed. 2021). "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her rights." *Levey v. Brownstone Asset Mgmt., L.P.*, 76 A.3d 764, 769 (Del. 2013). "Laches consists of two elements: (i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant." *Id.*

In this case, the plaintiffs have asserted claims for breach of fiduciary duty, which is an equitable tort.[8] The claim sounds in equity, so the doctrine of laches applies.

If a plaintiff has presented a court of equity with an equitable claim and only seeks money damages, then a modified form of laches applies. *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996). In this setting, "[w]here a plaintiff seeks a legal remedy in a court of equity and a statute of limitations exists for an analogous action at law, the statutory period may create a presumptive time period for application of laches to bar a claim." *Id.*

**B.      Unreasonable Delay**

The first element of the laches analysis is whether a plaintiff has delayed unreasonably in bringing the claim. Because the plaintiffs seek money damages, the court

---

[8] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see Restatement (Second) of Torts* § 874 cmt. b (Am. L. Inst. 1979), Westlaw (database updated Oct. 2021) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

looks to the limitations period that would govern a comparable claim at law. *Whittington*, 991 A.2d at 9. "A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches." *Levey*, 76 A.3d at 769. "Conversely, in equity, a lawsuit commenced within the analogous period of limitations is presumed to have been filed within a reasonable time." *Id.* at 769–70 (internal citation omitted).

A threshold issue challenge is to identify a statutory period for a comparable claim. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). For claims for breach of fiduciary duty that step is easy, because this court regularly looks to Section 8106 of Title 10 and its three-year limitations period. 10 *Del. C.* § 8106; *see, e.g.*, *Dean Witter*, 1998 WL 442456, at *4. The parties agree on that point.

Having identified a statutory period, the court must determine when the claim accrued, because the limitations period is calculated from that point of claim accrual. *Wal-Mart*, 860 A.3d at 319. After that, the court must determine whether any tolling doctrines could extend the statute of limitations. *Id.* The result is the analogous time period that forms the laches baseline.

### 1. The Time Of Accrual

"In addressing when an action is time-barred, a necessary first step in the analysis is determining the time when the action accrued." *U.S. Cellular*, 677 A.2d at 503; *accord Scharf v. Edgcomb Corp.*, 864 A.2d 909, 920 (Del. 2004) ("[I]t is imperative to identify a date certain when any statute of limitations begins to run."). "[A]ny period of limitation is utterly meaningless without specification of the event that starts it running. As a practical

matter, a 4-year statute of limitations means nothing at all unless one knows when the four years start running. If they start, for example, on the 10th anniversary of the injury, the 4-year statute is more akin to a 14-year statute . . . ." *Klehr v. A. O. Smith Corp.*, 521 U.S. 179, 199 (1997) (Scalia, J., concurring).

"The statute of limitations begins to run at the time that the cause of action accrues . . . ." *Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at *9 (Del. Ch. June 30, 2021) (quoting *Tyson Foods*, 919 A.2d at 584). Different jurisdictions use different rules to determine when a cause of action accrues.

> Some states accrue a cause of action when damages have been suffered or are ascertainable. Other states accrue a cause of action at the time of loss. Delaware, by contrast, declined to adopt these or other alternatives. Instead, Delaware is an occurrence rule jurisdiction, meaning a cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.

*ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020) (cleaned up).

"The 'wrongful act' is a general concept that varies depending on the nature of the claim at issue." *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, *7 (Del. Ch. Jan. 24, 2005). "In Delaware, for contract claims, the wrongful act occurs at the time a contract is breached." *ISN Software Corp.*, 226 A.3d at 732 (cleaned up). Thus, "the cause of action accrues at the time of breach." *Certainteed*, 2005 WL 217032, at *7, *quoted in ISN Software Corp.*, 226 A.3d at 732 n.22. "For tort claims . . . the wrongful act occurs at the time of injury." *Id.* at 732 (cleaned up). But the concept of injury for purposes of accrual does not require that a plaintiff have suffered quantifiable damages, even if pleading

41

damages is an element of the cause of action. *See ISN Software Corp.*, 226 A.3d at 733 ("Under the Delaware occurrence rule, injury is distinct from damages. The statute of limitations can start to run before any 'actual or substantial damages' occur."); *see also id.* 733 n.23. It is enough that there has been an injury, however slight, to the plaintiff's legal rights. *See Kaufman v. C.L. McCabe & Sons, Inc*., 603 A.2d 831, 834 (Del. 1992). "It is not required that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date." *Id.* (cleaned up).

As noted previously, a claim for a breach of fiduciary duty is an equitable tort. Under the standard formulation, "[t]he claim has only two formal elements: (i) the existence of a fiduciary duty that the defendant owes to the plaintiff and (ii) a breach of that duty." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840–41 (Del. Ch. 2022); *accord Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) ("To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it."). When a fiduciary makes a decision that the plaintiff alleges is wrongful, the decision is the wrongful act.[9] Like other types of claims, "[a] claim

---

[9] A standard exception is if the implementation of the board decision is conditioned on an additional event, such as a favorable stockholder vote, then a claim challenging the decision does not accrue until the condition is satisfied. *See Kaufman v. Albin*, 447 A.2d 761, 764 (Del. Ch. 1982); *Lavine v. Gulf Coast Leaseholds, Inc.*, 122 A.2d 550, 552 (Del. Ch. 1956) (Seitz, C.).

for breach of fiduciary duty accrues at the time of the wrongful act." *Sutherland v. Sutherland*, 2010 WL 1838968, at *8 (Del. Ch. May 3, 2010).

Applying this test is straightforward when a fiduciary makes an affirmative decision, such as when a board approves a contract or grants an option. The wrongful act takes place when the decision is made, and any cause of action for breach of fiduciary duty accrues at that point. As Chancellor Allen explained in a case where a plaintiff challenged a decision by an interested board majority to cause the corporation to enter into a contract with its controlling stockholder,

> [a]ny such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract and for nominal damages which are traditionally available in contract actions. Complete and adequate relief, if justified, could be shaped immediately or at any point thereafter.

*Seaboard*, 625 A.2d at 271.

Determining a time of accrual is more difficult when the wrongful act is not a singular decision but rather an ongoing series of continual decisions and non-decisions that extend over time. Courts have adopted different approaches depending on different settings. *See, e.g.*, Eric C. Surette, Annotation, *Accrual of Claims for Continuing Trespass or Continuing Nuisance for Purposes of Statutory Limitations*, 14 A.L.R.7th art. 8 (2016 & Supp); 4 Am. Jur. *Trials* 441 § 6 (1966).

One approach is to apply the same methodology used for discrete acts and look to the point at which the ongoing series begins. A seminal law review article on limitations periods explains that under this approach, "the period limiting actions to recover for *all* harm may commence upon the occurrence of the first invasion of the plaintiff's rights."

43

*Developments in the Law Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1205 (1950) [hereinafter *Developments*]; *see* Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 273 n.7 (2008) (describing *Developments* as "seminal").

Chancellor Allen's decision in *Seaboard* can be interpreted as applying this approach. The interested contract concerned "a ten year time charter of seven vessels" which required the company to pay substantial management fees and other sums over the ten-year period. 625 A.2d at 270. The corporation and its controller entered into the contract in 1986, but the plaintiff did not sue until 1990. Chancellor Allen rejected the plaintiff's contention that the approval of the contract created an ongoing wrong that lasted for all ten years of the contracting period. He reasoned that "the only liability matter to be litigated involves defendants' 1986 actions in authorizing the creation of these contract rights and liabilities." *Id.* at 1036. The cause of action accrued at the time of that distinct act. The next ten years involved the implementation of the contract and the possible manifestation of damages, but not an ongoing wrongful act or a series of wrongful acts.

A second approach aggregates into a single unit "a series of related and assertedly wrongful acts, decisions, or failures to act (each of which may or may not be sufficient on its own to form the basis for a separate claim) occurring both within and outside of the limitations period prior to suit." Graham, *supra*, at 280. Under the aggregation approach, the limitations period does not commence until the defendant ceases his wrongful conduct, because as long as the harm is ongoing, the cause of action is not yet complete. *Developments*, *supra*, at 1205.

This approach is often called the continuing wrong doctrine.[10] To plead a continuing wrong, the plaintiff must allege that the various acts are "so inexorably intertwined that there is but one continuing wrong." *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987). When a court determines that a continuing wrong exists, "the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitations period. That is, the cause of action does not accrue until the last act of the continuing wrong." *Kerns v. Dukes*, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004).

Designating a cause of action as a continuing wrong has significant implications for liability and damages, because it means that a court can impose liability, and a plaintiff can recover damages for the entire period during which the continuing wrong took place, including for periods that plainly preceded the applicable limitations period. Graham, *supra*, at 280–81. By contrast, under the discrete act approach, if the course of conduct began outside the limitations period, then the plaintiff cannot recover at all, even if the discrete act resulted in damage that manifests itself within the limitations period. *See* 54 C.J.S. *Limitations of Actions* § 279, Westlaw (database updated Nov. 2022).

---

[10] Other labels include the "continuing violation doctrine" (or the "continuing violations doctrine"). *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 114 (2002). When tort claims are involved, it can be called the "continuing tort doctrine." *Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1236–38 (10th Cir. 2001) (applying the continuing tort doctrine). When contract claims are involved, it can be called the "continuing breach doctrine." *See AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2016 WL 4440476, at *11–13 (Del. Ch. Aug. 22, 2016) (applying the continuing breach doctrine).

45

"Hostile work environment claims brought under Title VII of the Civil Rights Act of 1964 offer the paradigmatic example of this type of continuing violation." Graham, *supra*, at 281. The Supreme Court of the United States has explained that the very nature of a hostile work environment claim "involves repeated conduct." *Morgan*, 536 U.S. at 115. "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* The Court distinguished the ongoing nature of a hostile work environment from "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114–15.

> A plaintiff alleging a [continuous] hostile work environment can recover for all injurious manifestations of that environment, regardless of when they occurred, whether they would be actionable if sued upon individually, and when the plaintiff discovered the essential facts supporting his or her claim, provided that the same hostile environment persisted up into the limitations period prior to the filing of an administrative charge.

Graham, *supra*, at 281.

This court applied the continuing wrong doctrine to a claim for breach of fiduciary duty in *Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 WL 1437308 (Del. Ch. Apr. 14, 2017). The complaint supported a reasonable inference that between 2011 and 2015, a private equity firm and its conflicted representatives on the board of one of its portfolio companies caused the portfolio company to sell off its assets to create a pool of cash that the company would be forced to use to redeem the preferred stock held by the private equity firm. The defendants sought to treat each sale of an asset as a separate transaction to which a separate limitations period would apply, resulting in the complaint

46

being filed too late to challenge some of the transactions. The court rejected that argument, holding that it was reasonable to infer that "the defendants' actions outside the limitations period were all 'inexorably intertwined' with the redemptions that eventually occurred." *Id.* at *43. As a result, the plaintiff could not assert a claim until the redemption occurred, and the cause of action did not accrue until the redemption took place.[11]

A third approach takes ongoing conduct and "dissects [the] misbehavior, instead of aggregating it." Graham, *supra*, at 281. It thus "regards the perpetuation of, or (in some cases) failure to redress prior misconduct as wrongful and actionable in its own right, giving rise to a series of separate and fresh claims accruing within the limitations period on a day-by-day, act-by-act, or similarly parsed basis." *Id.* Under this approach, "each

---

[11] *Id.* Delaware courts have also considered the continuing wrong doctrine when applying the contemporaneous ownership requirement imposed by Section 327 of the Delaware General Corporation Law, 8 *Del. C.* § 327. The court has held that a series of similar decisions, such as a series of stock option grants, does not constitute a continuing wrong for purposes of the contemporaneous ownership requirement. *See Desimone v. Barrows*, 924 A.2d 908, 924–35 (Del. Ch. 2007) ("[T]he continuing wrong doctrine does not bestow standing upon a stockholder to challenge transactions occurring before he bought his stock simply because they are similar or related to transactions or other conduct that occurred later."); *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007) (holding that a plaintiff lacked standing to challenge backdated options grants occurring before he acquired his shares even though similar backdated grants continued to be made after the plaintiff became a stockholder"); *see also Chirlin v. Crosby*, 1982 WL 17872, at *2–3 (Del. Ch. 1982) ("The allegations of a continuing wrong . . . merely attempt to obscure the fact that the plaintiffs are actually complaining about the alleged diversion which took place [before the plaintiff acquired his stock]."); *Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121, 123 (Del. Ch. 1950) ("Of course, in one sense every wrongful transaction constitutes a continuing wrong to the corporation until remedied. But if the rule embodied in [§ 327's predecessor statute] is to be meaningful, then clearly 'continuing wrong' cannot be construed in such a sense because it would substantially defeat the statutory policy embodied in [§ 327's predecessor statute].").

continuation or repetition of the wrongful conduct may be regarded as a separate cause of action for which suit must be brought within the period beginning with its occurrence." *Developments*, *supra*, at 1205. This decision refers to this approach as the separate accrual doctrine.[12]

Writing while as a member of this court, then-Vice Chancellor Strine applied a version of the separate accrual doctrine in *Teachers' Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006). Stockholder plaintiffs sued derivatively on behalf of American International Group, Inc. (AIG) to invalidate and recover damages based on various managing general agent agreements between AIG and entities controlled by its CEO. The defendants argued that the agreements had been put in place thirty years earlier

---

[12] The terminology is unsettled, and one commentator notes that the continuing wrong approach and the separate accrual approach are "frequently confused or conflated." Graham, *supra*, at 275. He refers to a wrongful act subject to the continuing wrong approach as a "pure continuing violation," while calling a wrongful act subject to the separate accrual approach as a "modified continuing violation." Graham, *supra*, at 283.

Even one of the Delaware greats was not immune. In *Seaboard*, Chancellor Allen used the term "continuing wrong" to describe a separate accrual theory, writing that

> [w]here a continuing wrong acts as an answer to the defense of limitations it is typically the case that plaintiff can prove her claim by reference only to actions within the limitations period. Thus, for example, if plaintiff is complaining about a nuisance (a noise for example) emitted by a neighborhood plant for, say five years, plaintiff can prove her claim by proving the elements of the claim which occur daily or weekly or whenever, within the limitations period. It is irrelevant for limitations purposes that these daily or weekly invasions have been going on for years.

625 A.2 at 1035–36 (internal citation omitted).

48

such that any challenge was time-barred. *Id.* at 666. The court rejected that argument, noting that the board "had the business option of choosing not to continue that relationship annually, the complaint is not untimely as to the payments made to Starr in the period 2000 to 2004—*i.e.*, those payments beginning three years before the filing of the original complaint." *Id.* In reaching this conclusion, the court treated each year of performance under the contract as a newly accrued claim. *Id.*; *see also Price v. Wilm. Tr. Co.*, 1995 WL 317017, at *2 (Del. Ch. May 19, 1995) (applying separate accrual approach to claim that trustee breached its fiduciary duties and violated its contractual obligations by imposing a series of excessive charges over a seven-year period).

Applying the separate accrual theory has important implications for liability and damages. The plaintiff can prove liability and recover for acts that occurred during the limitations period, even if other aspects of the ongoing conduct occurred outside of the limitations period. *See ODN Hldg.*, 2017 WL 1437308, at *43; *Seaboard*, 625 A.2 at 1035–36; Graham, *supra*, at 282.

Claims of copyright infringement provide the paradigmatic example of this approach. Acts of infringement that are substantially similar can span an extended period, but copyright law imposes a three-year statute of limitations. *See* 17 U.S.C. § 507(b). A circuit split emerged between a minority position that applied the continuing wrong doctrine and a majority position that applied the separate accrual doctrine. *Compare Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983) (Posner, J.) (continuing wrong), *with Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 954 (9th Cir. 2001) (separate accrual). The Supreme Court of the United States resolved the circuit split by adopting the separate accrual

approach and holding that an ongoing infringement should be treated as a series of infringing acts such that the limitations period extends backward from the time of suit. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671, 677 (2014); *see* 2 Howard B. Abrams & Tyler T. Ochoa, *The Law of Copyright* § 16:18, Westlaw (database updated Oct. 2022).

Ongoing breaches of fiduciary duty under the Employment Retirement Income Security Act (ERISA) are also governed by the separate accrual approach.[13] In an illustrative decision, the United States District Court for the Southern District of New York considered a claim alleging that the fiduciaries of an employee benefit plan breached their fiduciary duties by failing to divest from improper investments in individual life insurance policies. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983). The court rejected the defendants' argument that the claim was time barred because the initial decision occurred outside the limitations period. *Id.* at 1520–21. The court reasoned:

---

[13] 60A Am. Jur. 2d *Pensions* § 754 ("Where the fiduciary breach is a recurring one, the limitations period for an action under [ERISA] with respect to the breach or violation of a fiduciary duty is triggered anew each time another in the series of violations occurs, as, for example, each time a pension fund is injured as a result of unlawful investments or excessive benefit payments." (footnotes omitted)); *see Morrissey v. Curran*, 567 F.2d 546 (2d Cir. 1977) (holding claim timely under ERISA for breach of duty from failing to divest plan of unlawful investment even though original decision to invest pre-dated ERISA and was lawful); *see also Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195 (1997) (concluding that when an employer fails to make obligatory installment payments under ERISA, "each missed payment creates a separate cause of action with its own . . . limitations period"); *Bd. of Trustees of Dist. No. 15 Machinists' Pension Fund v. Kahle Eng'g Corp.*, 43 F.3d 852, 857–861 (3d Cir. 1994) (statute of limitations runs from each missed ERISA payment, but damages are limited to those that fall within limitations period).

The flaw in defendants' argument is that as Fund fiduciaries they were under a continuing obligation to advise the Fund to divest itself of unlawful or imprudent investments. Their failure to do so gave rise to a new cause of action each time the Fund was injured by its continued possession of individual policies, that is, each time it made a premium payment.

*Id.* at 1521. Consistent with the separate accrual rule, the court limited the trustees' liability to the harm suffered within the limitations period.[14]

When deciding on the accrual method for a particular claim, commentators recommend considering the gravamen of the claim and the nature of the harm, the accrual method's ability to maximize the equities and efficiencies of litigation, and the extent to which the method appropriately balances the policy considerations associated with statutes of limitations.[15] On one side of the ledger are considerations associated with finality,

---

[14] *Id.* at 1522. Continuing antitrust violations also implicate the separate accrual rule. *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982) ("[T]he continuing conspiracy or continuing violation exception . . . permits a cause of action to accrue whenever the defendant commits an overt act in furtherance of an antitrust conspiracy or, in the absence of an antitrust conspiracy, commits an act that by its very nature is a continuing antitrust violation."); *Barnosky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981) ("When a continuous antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants.").

[15] *See* Graham, *supra*, at 277, 283; *Developments*, *supra*, at 1200–01. There are other possible accrual approaches beyond the three discussed above the line. Under one alternative, "the period for all harm may be postponed until there is a manifestation of compensable harm." *Developments*, *supra*, at 1205. Many jurisdictions follow a rule in which a plaintiff must suffer some compensable harm before being able to file suit, and in those states, a cause of action does not accrue until that element is satisfied. *Id.* at 1204. There is much to recommend that approach as a method of avoiding premature lawsuits over wrongs that never blossom into damages, while at the same time providing a concrete setting for litigating actual harms. Delaware, however, has declined to tie accrual to the

51

including the advantages that repose has for the certainty of legal relationships, the savings

of judicial and litigant resources that result from avoiding litigation over stale claims, and

the improved reliability of results when evidence is fresh. On the other side of the ledger

are considerations associated with access to justice, including the importance of providing

plaintiffs with a fair opportunity to present their claims and the savings of judicial and

litigant resources that result from avoiding premature lawsuits on issues that may never

ripen into meaningful disputes.[16] For Delaware corporate law, an additional policy

---

realization of compensable damages. *ISN Software*, 226 A.3d at 732–33, 733 n.23. That alternative would be inconsistent with Delaware law.

Courts have developed a variety of other approaches when wrestling with the accrual of civil RICO claims. *See generally* G. Robert Blakey, *Time-Bars: Rico-Criminal and Civil-Federal and State*, 88 Notre Dame L. Rev. 1581 (2013); Paul B. O'Neill, *"Mother of Mercy, Is This the Beginning of RICO?": The Proper Point of Accrual of A Private Civil RICO Action*, 65 N.Y.U. L. Rev. 172 (1990). As with a *Caremark* claim, a plaintiff pursuing a civil RICO claim must use a variety of sources to piece together wrongful conduct that is difficult to identify and which may have occurred over a lengthy period. Taking into account those features of the claim, courts have developed a range of possible accrual rules. *See* Blakely, *supra*, at 1702–30; O'Neill, *supra*, at 197–234. Those regimes each have their pros and cons, and each could be tailored to a Red-Flags Theory or a *Massey* Theory. This decision has tried to stay closer to home and consider only accrual regimes that Delaware courts have used previously to evaluate claims for breach of fiduciary duty.

[16] *See generally* Melissa DiVincenzo, *Repose vs. Freedom—Delaware's Prohibition on Extending the Statute of Limitations by Contract: What Practitioners Should Know*, 12 Del. L. Rev. 29, 31 (2010) (identifying rationales for statutes of limitations); Graham, *supra* at 277 (same); *Developments*, *supra*, at 1200–03 (same).

consideration is our reliance on private litigants to enforce legal norms and provide fiduciary accountability.[17]

### a.     The Red-Flags Theory

One possibility would be to use the discrete act approach for the Red-Flags Theory. That approach makes the most sense when (i) the gravamen of the action involves a finite quantum of conduct that causes all of the harm which may result, such that the continuation or repetition of the act will not increase the plaintiff's damages, and (ii) the initial impact of the act provides the potential plaintiff with both knowledge of the conduct and an incentive to sue. *See Developments*, *supra*, at 1205. When a claim has those features, the discrete act approach gives a plaintiff an incentive to proceed promptly by filing a single suit that can address all of the harm resulting from the discrete act. By contrast, either a continuing wrong or a separate accrual approach makes more sense when it is difficult to identify a clear starting point for a claim, and the harm develops gradually over time. *Id.* at 1207.

---

[17] *See, e.g.*, *Bird v. Lida, Inc.*, 681 A.2d 399, 402–03 (Del. Ch. 1996) (Allen, C.) (discussing system of private enforcement); Reinier Kraakman et al., *When Are Shareholder Suits in Shareholder Interests?*, 82 Geo. L.J. 1733, 1733 (1994) ("Shareholder suits are the primary mechanism for enforcing the fiduciary duties of corporate managers."); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1, 10 (1991) ("The shareholder's derivative suit is one of many devices in corporate law for controlling these conflicts between managers and shareholders."); Donald E. Schwartz, *In Praise of Derivative Suits: A Commentary on the Paper of Professors Fischel and Bradley*, 71 Cornell L. Rev. 322, 323 (1986) ("Liability rules, enforced by shareholder litigation, are theoretically sound and profoundly affect the conduct of corporate managers, at least some aspects of their duties.").

The gravamen of a Red-Flags Theory is that management and the directors "consciously failed to monitor or oversee [the corporation's] operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. To plead a Red-Flags Theory, a plaintiff might allege, for example, that the directors

> ignored "red flags" indicating misconduct in defiance of their duties. A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning.

*David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 WL 391931, at \*5 (Del. Ch. Feb. 13, 2006) (footnote omitted).

A Red-Flags Theory thus has two aspects. One involves the initial decision to consciously ignore a particular red flag. The other involves the ongoing series of explicit or implicit decisions to continue consciously ignoring the red flag. Fiduciaries who have committed a knowing failure to act on day one will engage in the same knowing failure on day two and on each day thereafter until they eventually respond to the red flag. A Red-Flags Theory is thus not solely a discrete act; it has an ongoing dimension.

Another feature of a Red-Flags Theory is that there is rarely a single and definitive red flag. Grounds for alarm typically add up over time. Admittedly there sometimes will be a clear and dramatic event, such as an airplane crash, that shines like a beacon and puts directors on notice. *See In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at \*34 (Del. Ch.

Sept. 7, 2021). ("The Lion Air Crash was a red flag about [a new software system] that the Board should have heeded but instead ignored."). More commonly, the situation evolves.[18]

The same is true for the harm. Yes, there will be rare cases in which the failure to ignore a clear red flag like an airplane crash leads to immediate harm, such as a second airplane crash and a business shutdown. *See Boeing*, 2021 WL 4059934, at \*17. More commonly, the initial decision to ignore a red flag may have no immediate effect, and meaningful injury may not result until years later. In this case, the harm that AmerisourceBergen suffered escalated over a decade, with AmerisourceBergen bearing litigation costs, suffering reputational damage, and paying out individual settlements along the way before ultimately agreeing to massive settlements in 2021.

Those features make a discrete act approach ill-suited to a Red-Flags Theory. Using a discrete act approach would treat a Red-Flags Theory as if the fiduciaries made a singular decision, ignoring its ongoing dimension. The approach also would treat a Red-Flags Theory as if the singular act of ignoring the first red flag was both easily identifiable to a

---

[18] *See, e.g.*, *Hughes v. Hu*, 2020 WL 1987029 (Del. Ch. Apr. 27, 2020) (denying motion to dismiss where board received multiple audit reports identifying audit risks and control weaknesses over three-year period); *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065 (Del. Ch. Aug. 24, 2020) (denying motion to dismiss 2019 complaint, which alleged board ignored red flags dating back to 2006 that indicated non-compliance with federal Food and Drug Administration regulation); *cf. Reiter v. Fairbank*, 2016 WL 6081823, at \*13 (Del. Ch. Oct. 18, 2016*)* (finding company's "escalating . . . compliance risk" and "heightened regulatory scrutiny" over two-year period were "yellow flags of caution").

plaintiff outside the organization and would lead by itself to all of the harm that the entity would suffer. Neither is true.

A discrete act approach also fares poorly when evaluated from the standpoint of the equities and efficiencies of litigation and the policy considerations associated with limitations periods. To be sure, a discrete act approach is more likely to deliver the benefits of repose to defendants, because it is more likely to result in claims being time-barred. But the discrete act approach achieves these benefits at the cost of providing a fair opportunity for plaintiffs to present their claims.

Ordinarily, a discrete act approach might be expected to encourage the prompt enforcement of claims while conserving judicial and litigant resources by barring stale claims, but those benefits are unlikely for a Red-Flags Theory. The chronic problem in stockholder derivative litigation involves entrepreneurial plaintiffs' counsel seeking to sue too quickly because of the competitive dynamics involved in gaining control of a case. *See La. Mun. Police Empls.' Ret. Sys. v. Pyott*, 46 A.3d 313, 336 (Del. Ch. 2012) (describing competitive dynamics that lead to fast filing), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013). The Delaware courts have consistently dismissed cases where stockholders sued quickly without taking the time to conduct a meaningful investigation. *Id.* at 343–44. "Put simply, fast-filing generates dismissals." *Id.* at 344.

Under a discrete act regime, more plaintiffs are likely to file suit prematurely rather than risk having the limitations period run. That understandable response will generate cases about conceptual harms that may never ripen into meaningful disputes. As a

56

consequence, both courts and litigants consume resources addressing matters that are not ready for litigation.

And there is another problem. The decisions addressing premature complaints are likely to result in dismissals, which under current law have preclusive effect on the ability of any other stockholder to pursue the same or similar claims. *See Cal. State Tchrs.' Ret. Sys. v. Alvarez*, 179 A.3d 824, 843–44 (Del. 2018) (holding that Rule 23.1 dismissal had preclusive effect under standard that required a final judgment on the merits); *Pyott v. La. Mun. Police Employs.' Ret. Sys.*, 74 A.3d 612, 617 (Del. 2013). That outcome undercuts the accountability system of Delaware law. Meanwhile, because the premature lawsuits are unlikely ever to reach the merits, the potential benefits from resolving cases while evidence is fresh never arise. Instead, premature lawsuits are likely to increase the number of pleading-stage false negatives, resulting in preclusive dismissals in situations where a complaint filed later and after greater diligence could demonstrate the need for post-pleading-stage investigation.

Requiring a plaintiff to file suit within the limited period of time tied to an initial wrongful act makes sense for purposes of a discrete act. When the wrongdoing is ongoing, cutting off the accountability mechanism allows the wrongdoing to continue. Delaware should not be in the business of facilitating ongoing wrongdoing, suggesting that the discrete act approach should not be the law for a Red-Flags Claim.

That conclusion leads to the next possibility, which would be to apply the continuing wrong approach and treat a Red-Flags Theory as viable until the fiduciary takes action to

address the red flags. Conceptually, that approach is a better fit, but it goes too far in the other direction.

From the standpoint of the gravamen of the claim, the continuing wrong approach presents the mirror image of the discrete act approach. The continuing wrong approach affords full significance to the ongoing nature of the decision to ignore red flags, but de-emphasizes the reality that the ongoing act started at some point. It thus fits no better than the discrete act approach.

The continuing wrong approach does better than the discrete act approach in accommodating the origins and nature of the harm. Using a continuing wrong approach acknowledges that it is difficult for an outsider to determine when the first red flag is ignored. It also acknowledges that the harm from ignoring red flags is likely to grow over time.

In terms of the equities and efficiencies of litigation and the policy considerations associated with limitations periods, the continuing wrong approach generates a range of benefits and detriments. Most notably, the approach does not deliver the benefits of repose to defendants until the ongoing conduct stops. It thus opens the door to the potential litigation of stale claims and a greater risk of erroneous results as memories fade and evidence is lost. Counterbalancing those effects are the benefits of avoiding an additional incentive for the filing of premature lawsuits. On the margin, using the approach could lead to additional litigation over events long past, with concomitant burdens on the parties and the courts.

The third possibility is the separate accrual approach. It provides a Goldilocks solution.

In terms of the gravamen of the claim, the separate accrual approach recognizes that a Red-Flags Theory has two dimensions. The wrong began at some point, but also persists until the fiduciaries correct it. The ability of a board to take action to end a red flag scenario makes the situation analogous to *Aidinoff*, where the board had the option each year to terminate the offending contracts. The separate accrual approach acknowledges both aspects of the claim.

The separate accrual approach also accommodates the difficulty in identifying the accrual of a claim from outside the organization and the nature of the harm. The separate accrual approach does not require a plaintiff to sue quickly and potentially prematurely. Once a corporate trauma has occurred, a plaintiff can sue on the corporation's behalf for the harm that the corporation suffered during the actionable period leading up to the lawsuit. When a corporation has suffered a trauma, the actionable period should encompass the bulk of the harm. Unlike the discrete act approach, there is no risk that an early point of accrual will make the wrongdoing non-actionable in its entirety. And unlike with the continuing wrong approach, there is no risk that the damages figure can extend back across time to the earliest possible act.

In terms of equities, efficiencies, and policy considerations, the separate accrual approach strikes an appropriate balance by respecting the important interests served by limitations periods while preserving a litigation vehicle that can provide accountability and generate compensation for injuries. The separate accrual method provides a measure of

repose to defendants by recognizing that some wrongdoing has occurred too far in the past to be actionable. And by avoiding damages claims involving events long past, the separate accrual method reduces the risk of erroneous results based on stale evidence. At the same time, the separate accrual approach does not simplistically treat the wrong as a singular event such that after the limitations period has run, the ongoing wrongdoing can continue with impunity. By recognizing the ongoing nature of the wrong, the separate accrual approach preserves the ability of the corporation to recover for harms that it has suffered during the actionable period and facilitates meaningful litigation oversight. Meanwhile, the focus on the actionable period promotes the likelihood of accurate results by centering the litigation on periods of time when the evidentiary record is relatively fresh.

This decision therefore concludes that to determine the time at which the Red-Flags Claim accrued, the proper method is the separate accrual approach.

### b. The *Massey* Theory

Similar considerations apply to the *Massey* Theory. The principal difference is that in a Red-Flags Claim, the fiduciary makes a conscious decision to ignore red flags. In a *Massey* Claim, the fiduciary makes a conscious decision to prioritize profit over legal compliance.

The analysis of the gravamen of the claim and the nature of the harm proceeds along similar lines. Like a Red-Flags Theory, a *Massey* Theory combines an initial wrongful act with the ongoing continuation of that act. The initial wrongful act underlying a *Massey* Claim is more prominent and serious, because the plaintiff must allege that the defendants made a specific decision to pursue profit over legal compliance. But the wrongful act does

60

not end on that date. The ongoing violation continues as the company pursues the illegal strategy. As in *Aidinoff*, the fiduciaries can decide at any time to stop the illegal business plan and take corrective action.

A *Massey* Theory also resembles a Red-Flags Theory in that it may be difficult to identify a specific point at which the wrongful decision was made. Corporate fraud and illegality can involve deliberateness from the outset, but it often manifests as a classic slippery-slope problem, where what eventually manifests as wrongdoing "starts small and innocently and then builds." Donald. C. Langevoort, *Selling Hope, Selling Risk: Corporations, Wall Street, and the Dilemmas of Investor Protection*, 36 (2016). What results is

> a process that begins with some period of time during which there is no perception of wrongfulness that needs rationalization, which only later turns into awareness that something is amiss. Precisely because of the now-deep commitment, the cognitive pressure to justify deception at this point is stronger than it would be at the outset, and self-serving inference goes to work . . . . The third stage comes late in the process: the realization that one's rationalizations were just that.

*Id.* at 37.

This case presents that possibility. The plaintiffs argue that management and the board adopted a business plan that prioritized profits over compliance based on decisions they made over a five-year period, starting with the Independent Pharmacy Strategy, continuing with the Walgreens alliance, and culminating in the adoption of the Revised OMP, with disregard for regulatory compliance and order-diversion monitoring along the way. The plaintiffs allege, as they must, that the wrongful business strategy started with the Independent Pharmacy Strategy, and they view the Revised OMP as definitive evidence

61

of the type of conscious disregard of consequences that evidences bad faith. They concede, however, that the case for inferring that management and the board knowingly pursued an illegal business strategy grows stronger over time. It is possible that different members of management and the board crossed the line at different points. Perhaps some members of management had the whole plan in mind at the outset. Perhaps some members of the board only reached the point of conscious disregard with the Revised OMP.

As with a Red-Flags Theory, the evolving nature of the *Massey* Theory makes it difficult to identify from the outside when the claim accrues for filing purposes. And as with a Red-Flags Theory, the damages that a *Massey* Claim generates are likely to increase over time. Indeed, with a *Massey* Claim, the business plan initially may generate positive results, precisely because the plan prioritizes profit over legal compliance. Only as the problems associated with legal noncompliance accumulate will the negative consequences become apparent, eventually bursting forth as a corporate trauma.

From the standpoint of the gravamen of the claim and the nature of the harm, the Red-Flags Theory and the *Massey* Theory operate similarly. Just as those considerations support rejecting the discrete act approach for a Red-Flags Theory, they counsel similarly against using the discrete act approach for a *Massey* Theory.

The analysis of the equities and efficiencies of litigation and the policies associated with limitations periods is also similar. Even more so than with a Red-Flags Theory, a discrete act approach would be likely to fixate on the initial decision to adopt an illegal business plan and risk insulating the ongoing pursuit of that plan from a challenge. Such

an approach would provide the defendants with repose and finality, but at the expense of deterrence, accountability, and compensation for injury.

The real question for the *Massey* Theory is whether there is an additional degree of culpability associated with the affirmative adoption of a business plan that prioritizes profit over legal compliance such that the continuing wrong approach should apply rather than the separate accrual approach. Notwithstanding Delaware authorities equating action and conscious inaction,[19] humans intuitively distinguish between the two and associate greater culpability with an affirmative act rather than a conscious decision not to act.[20]

---

[19] *See Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) (subsequent history omitted) ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule"); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant]. A conscious decision not to take action is just as much of a decision as a decision to act."); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) ("The Special Committee decided not to take any action with respect to the Audit Committee's termination of two successive outside auditors and the allegations made by Ernst & Young. The conscious decision not to take action was itself a decision."); *Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011) ("Wesco stockholders had a choice: they could make an election and select a form of consideration, or they could choose not to make an election and accept the default cash consideration."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); Jean-Paul Sartre, *Existentialism Is a Humanism* 44 (Carol Macomber trans., Yale Univ. Press 2007) ("[W]hat is impossible is not to choose. I can always choose, but I must also realize that, if I decide not to choose, that still constitutes a choice.").

[20] *See, e.g.*, George C. Christie, *The Defense of Necessity Considered from the Legal and Moral Points of View*, 48 Duke L.J. 975, 1013 (1999) (applying intuition to the Trolley Problem and analogizing to common law distinction between misfeasance and

Using the continuing wrong approach might be compelling for a claim against officers and directors who had embraced the Chicago School concept of "law as price."[21] Assume that a board and management team made a conscious decision to violate the

nonfeasance). This intuition may stem in part from lived experience in which inaction is less likely to be intentional. That intuition breaks down when, as with a *Massey* Claim and a Red-Flags Claim, the two scenarios require the same level of moral culpability—in this instance, bad faith. *Cf.* Richard S. Kay, *Causing Death for Compassionate Reasons in American Law*, 54 Am. J. Comp. L. 693, 712 (2006) (explaining that the persistence of a distinction between action and inaction "may reflect some idea that inaction often can be explained by inadvertence or mistake, while positive actions are, more generally, intentional" and that when the categories each involve intentional decisions, "the differential legal treatment of misfeasance and nonfeasance seems contrived").

[21] *See, e.g.*, Daniel R. Fischel, *The Corporate Governance Movement*, 35 Vand. L. Rev. 1259, 1271 (1982) ("A firm may also find it advantageous to violate a law deliberately and pay the penalty for the same reason that an individual in some cases may prefer to breach a contract and pay damages. Because the gains from breach or violation presumably exceed the social costs (as reflected in the penalty), compliance with the statute or contract is undesirable from a personal as well as a social perspective."); Frank H. Easterbrook & Daniel R. Fischel, *Antitrust Suits by Targets of Tender Offers*, 80 Mich. L. Rev. 1155, 1168 n.36 (1982) ("Managers have no general obligation to avoid violating regulatory laws, when violations are profitable to the firm."); *id.* at 1177 n.57 ("[M]anagers do not have an ethical duty to obey economic regulatory laws just because the laws exist. They must determine the importance of these laws. The penalties Congress names for disobedience are a measure of how much it wants firms to sacrifice in order to adhere to the rules; the idea of optimal sanctions is based on the supposition that managers not only may but also should violate the rules when it is profitable to do so."); David L. Engel, *An Approach to Corporate Social Responsibility*, 32 Stan. L. Rev. 1, 34–55 (1979) (arguing that corporations can and should maximize profits by factoring in the cost of regulatory and legal sanctions discounted by likelihood of detection and successful enforcement). *See generally* Cynthia A. Williams, *Corporate Compliance With the Law In the Era of Efficiency*, 76 N.C. L. Rev. 1265, 1285–1300 (1998) (collecting and summarizing authorities endorsing the view of "law-as-price"). As *Massey* and related authorities demonstrate, Delaware law explicitly rejects the notion that a board of directors can act loyally by consciously deciding to violate positive law in pursuit of greater profits. *See* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 649 (2010).

regulatory laws by engaging in illegal behavior and, over a decade, paid numerous fines and penalties that were dwarfed by the profits that non-compliance generated. Further assume that there was sufficient public disclosure about the practice, either through public information about the fines themselves or through news articles, such that tolling doctrines would not operate under the separate accrual approach to extend the actionable period. In this scenario, the separate accrual approach only would permit the imposition of liability and recovery for the harm that the corporation suffered during the final three years of the scheme. Some might argue that in an egregious setting like this one, both liability and damages should extend throughout the period of the scheme. Only the continuing wrong approach achieves that result.

Whether to apply the continuing wrong approach rather than the separate accrual approach is thus a fundamentally difficult policy question that would take lots of pages to explore and resolve. In terms of practical outcomes for litigation, the real difference is in the magnitude of damages. Nominally, there are differences for both liability and damages, because the continuing wrong approach permits a plaintiff to prove liability and recover damages for the entire period that the illegal business plan was in place, while the separate accrual approach limits liability and damages to the actionable period. But the factual inquiry for the separate accrual approach often will need to examine earlier periods to determine what the directors and officers knew and either continued doing or permitted to persist during the actionable period. Because of the nature of the factual inquiry, the choice between the two accrual rules principally affects damages.

The fact that the main difference between the approaches is the quantum of damages provides another reason for not choosing between the continuing wrong and the separate accrual approach at this stage. A court does not typically parse the scope of damages at the pleading stage. A plaintiff can plead the existence of damages generally as long as the complaint supports a reasonable inference of harm. *See, e.g.*, *In re Ezcorp, Inc. Consulting Agr. Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 19 (Del. Ch. 2009).

At a minimum, the separate accrual approach applies to the *Massey* Claim. As discussed below, that conclusion is sufficient to render the claim timely. This decision therefore need not confront the additional question of whether the continuing wrong approach should apply to this subspecies of claim. At the pleading stage, it is sufficient to measure the time at which the *Massey* Claim accrued using the separate accrual approach.

### 2. When The Plaintiff Began To Pursue The Claim

Having decided to apply the separate accrual methodology, I must now determine the period of time during which the ongoing conduct is actionable. In this case, the plaintiffs filed this plenary action on December 30, 2021, so the actionable period would start on December 30, 2018. But for a derivative action in which the plaintiff has sought books and records, the court can calculate the actionable period using an earlier date tied to the plaintiff's diligent pursuit of its informational rights. Because the laches analysis is flexible and does not turn on statutory standing under Section 220, the court can look to when the plaintiff began pursuing books and records. The court need not fixate on whether the plaintiff formally filed a books-and-records action.

66

When applying the doctrine of laches, "[w]hat constitutes unreasonable delay and prejudice are questions of fact that depend upon the totality of the circumstances." *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002). "In determining whether the delay is unreasonable the situation of the plaintiff, as well as that of defendant, must be considered." Henry L. McClintock, *Handbook of the Principles of Equity* § 28 at 72 (2d ed. 1948). The doctrine of laches is rooted in the maxim that "equity aids the vigilant, not those who slumber on their rights." *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982). A plaintiff who vigilantly pursues a claim is not engaging in unreasonable delay for purposes of a laches analysis.

These principles enable a court to take into account a plaintiff's diligent use of Section 220. While serving as a Vice Chancellor, Chief Justice Steele noted that a plaintiff could defeat a laches defense by showing that the plaintiff "asserted its rights in a timely manner by making demand [for books and records] and filing this action." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 714 A.2d 96, 105 (Del. Ch. 1998). He explained that the pursuit of books and records provided "strong evidence that plaintiff was aggressively asserting its claims" for purposes of a laches analysis. *Id.*

Justice Jacobs subsequently applied these principles while serving as a Vice Chancellor. He rejected a timeliness defense by noting that the plaintiffs had pursued a Section 220 action to obtain books and records. *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *9 (Del. Ch. May 31, 2000). He regarded it as "settled Delaware law that the institution of other litigation to ascertain the facts involved in the later suit will toll the statute while that litigation proceeds." *Id.* For the source of the rule, he cited *Cahall v.*

67

*Burbage*, where Chancellor Josiah Wolcott observed that "[d]elay pending other proceedings has frequently been held excusable . . . where the termination of such proceedings was necessary for the ascertainment of facts involved in the later suit." 119 A. 574, 576–77 (Del. Ch. 1922) (quoting *Cent. R.R. Co. of N.J. v. Jersey City*, 199 F. 237, 245 (D.N.J. 1912), *aff'd*, 212 F. 76 (3d Cir. 1914)). Justice Jacobs added that when a stockholder had spent time pursuing books and records,

> [i]t would be perverse if the rule were otherwise. On at least two occasions the Supreme Court has expressly encouraged potential derivative plaintiffs to utilize the 'tools at hand' to obtain information bearing on the subject of their claims, in order to avoid an unseemly race to the courthouse to file 'a plethora of superficial complaints that could not be sustained.' To accept the defendants' time-bar argument would penalize, not encourage, the use of those important tools."

*Technicorp*, 2000 WL 713750, at *9 n.26 (quoting *Rales v. Blasband*, 634 A.2d 927, 932–35, n.10 (1993)). Even in 2000, the estimate of only two exhortations missed low, and in the two decades since then, the calls for stockholders to use Section 220 before filing suit have only increased.[22]

---

[22] *See, e.g.*, *King v. VeriFone Hldgs., Inc.*, 12 A.3d 1140, 1145 (Del. 2011) ("Delaware courts have strongly encouraged stockholder-plaintiffs to utilize Section 220 before filing a derivative action, in order to satisfy the heightened demand futility pleading requirements of Court of Chancery Rule 23.1."); *Beam v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004) ("Both this Court and the Court of Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts."); *White v. Panic*, 783 A.2d 543, 556–57 (Del. 2001) ("This case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using the tools at hand including the use of actions under 8 *Del. C.* § 220 for books and records, before filing a complaint. . . . Further pre-suit investigation in this case may have yielded the particularized facts required to show that demand is excused or it may have revealed that the board acted in the best interests of the corporation." (cleaned up)); *Brehm v. Eisner*,

Vice Chancellor Lamb subsequently gave effect to a plaintiff's diligent use of Section 220 when denying a motion to dismiss on laches grounds in *Sutherland v. Sutherland*, 2009 WL 857468 (Del. Ch. Mar. 23, 2009). The plaintiff had served a books-and-records demand and filed suit on August 31, 2001. The final opinion in the Section 220 action was not entered until May 16, 2006. The plaintiff filed her complaint promptly after receiving the books and records. Vice Chancellor Lamb reasoned as follows:

> The applicable three-year statute of limitations was tolled, however, during the pendency of the plaintiff's Section 220 action. The final opinion in the 220 action was entered on May 16, 2006, and the plaintiff filed her complaint on September 6, 2006, less than 120 days later. Given the time between the entry of the opinion and the actual production of the demanded books and records, and affording the plaintiff time to evaluate any potential claims in light of what was produced, the short window between the closing of the 220 action and the filing of the original complaint in this action is reasonable, and the statute is likewise tolled during that period. The plaintiff's claims are therefore time-barred as to any transactions occurring more than three years prior to the date the 220 action was instituted, *i.e.*, prior to August 31, 2001.

*Id.* at *5 (cleaned up).

---

746 A.2d 244, 266–67 (Del. 2000) (disregarding plaintiffs' complaint "that the system of requiring a stockholder to plead particularized facts in a derivative suit is basically unfair because the Court will not permit discovery under Chancery Rules 26–37 to marshal the facts necessary to establish that pre-suit demand is excused" in part because "plaintiffs may well have the 'tools at hand' to develop the necessary facts for pleading purposes" by seeking "relevant books and records of the corporation under Section 220"); *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 78–79 (Del. 1997) (subsequent history omitted) ("Plaintiffs inexplicably did not bring [a Section 220 action before filing their derivative complaint]. Accordingly, plaintiffs cannot argue that they have used the available tools at hand to obtain the necessary information before filing a derivative action." (cleaned up)); *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 n.3 (Del. 1997) ("This Court has encouraged the use of Section 220 as an information-gathering tool in the derivative context, provided a proper purpose is shown." (cleaned up)).

For purposes of the separate accrual method, the court must determine when the plaintiff began to pursue its claims vigilantly. The defendants assert that the point of vigilant pursuit cannot precede the date on which the plaintiff filed an action under Section 220(c) to obtain books and records. The *Sutherland* decision used the filing date, but the court did not need to look back any earlier to address the laches issue. There are also decisions where this court has focused on the filing date rather than the demand date when evaluating standing for purposes of a Section 220 action. *See, e.g.*, *Swift v. Houston Wire & Cable Co.*, 2021 WL 5763903, at *4 (Del. Ch. Dec. 3, 2021). Those decisions apply the statutory language of Section 220, which requires that a plaintiff be a stockholder when an enforcement action is filed. 8 *Del. C.* § 220(c).

The doctrine of laches is flexible and requires case-specific analysis. For laches, a rule that turned on the filing of a Section 220 enforcement action would incentivize the filing of more enforcement actions (which the court does not need), simply to secure a tolling benefit. This court has strived to promote extra-judicial resolutions of books-and-records disputes. *See, e.g.*, *Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *9 (Del. Ch. Aug. 31, 2022) ("[T]his court encourages corporations to produce Formal Board Materials in response to meritorious demands for inspection without forcing stockholders to litigate over them."). A rule based on the filing of an enforcement action would undermine that effort.

A stockholder therefore should receive credit for serving a demand and obtaining books and records without the need for an enforcement action. But that does not mean that simply sending a demand will yield a benefit in every case. The stockholder plaintiff must

70

pursue the demand diligently to gain a benefit. *See, e.g.*, *Firemen's Ret. Sys. of St. Louis v. Sorenson*, 2021 WL 4593777, at \*11 (Del. Ch. Oct. 5, 2021). That does not mean pressuring the defendant corporation relentlessly, and it does not mean always filing an enforcement action, but it also should not involve months-long periods of stockholder-side inactivity. The process should move forward with deliberate speed.

In this case, the plaintiffs served their books-and-records demand on May 21, 2019. On June 7, 2019, AmerisourceBergen refused the demand, claiming incomprehensibly that the stockholders lacked a credible basis to suspect corporate wrongdoing and therefore did not have a proper purpose for obtaining any books and records. After failed efforts to negotiate, the plaintiffs filed their books-and-records action on July 8, 2019. *Lebanon Cnty. Empls. Ret. Fund vs. AmerisourceBergen Corp.*, C.A. No. 2019-0527, Dkt. 1 (Del. Ch. July 8, 2019). That litigation turned into a Section 220 gauntlet, with AmerisourceBergen seeking to litigate the merits of an eventual derivative action in the context of the Section 220 proceeding. The case was not resolved until July 12, 2022, nearly three years later. *Id.*, Dkt. 75.

The plaintiffs' diligent efforts could support using May 21, 2019, as a starting date for calculating the actionable period, which would cause the actionable period to reach back to May 21, 2016. But the plaintiffs do not seek that outcome. They are content to use October 20, 2019, as the starting date. Using that date, the actionable period begins on October 20, 2016, and ends on December 30, 2022.

### 3.    Tolling Doctrines

The next step in the analysis is to consider tolling doctrines. Delaware has many doctrines that can toll a statute of limitations. Some, such as infancy and incapacity, rarely play a role in corporate and commercial disputes. Others, such as inherently unknowable injuries, fraudulent concealment, and equitable tolling, make frequent appearances.

Tolling doctrines operate in a straightforward manner when a court is applying the discrete act approach and the plaintiff has sued outside the presumptive limitations period. The court simply asks whether there are grounds to permit the plaintiff to sue over the discrete act notwithstanding the expiration of the limitations period.

Tolling doctrines have limited effect when a court is applying a continuing wrong approach. Under that doctrine, the cause of action does not accrue until the conduct ceases. As long as a part of the continuing wrong takes place within the limitations period, then the plaintiff can prove liability and damages for the entire time that the continuing wrong was ongoing, regardless of whether the limitations period would have run if calculated from when the continuing wrong began. If the conduct remains ongoing at the time suit is filed, then tolling doctrines have no role to play. The fact that the conduct remains ongoing renders the entire continuing wrong actionable. *See, e.g.*, *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134–35 (E.D.N.Y. 2000). *See generally* Graham, *supra*, at 272.

Tolling doctrines still can have some effect under a continuing wrong regime. Envision a scenario in which the continuing wrong persisted for some time then stopped. For the continuing wrong doctrine to apply, at least part of the ongoing wrongful conduct must have occurred within the limitations period, so with the cessation of the act, the

72

limitations period begins to run. If a plaintiff does not file suit until after the limitations period has expired, then a plaintiff may invoke tolling doctrines to render the lawsuit timely.

Under a separate accrual system, tolling doctrines have two roles to play. As with the continuing wrong approach, once the ongoing action has stopped, then the statute of limitations begins to run. If the plaintiff does not file suit until after the limitations period has run as measured from the cessation of the wrongful activity, then a plaintiff can invoke tolling doctrines to demonstrate that the suit is timely. But tolling doctrines also play a second role, similar to the role they have in a discrete act system. The separate accrual system only treats the portion of the ongoing conduct that takes place within the limitations period as actionable. As with the discrete act system, a challenge to the portion of the ongoing conduct that precedes the actionable period is untimely. As with the discrete act system, a plaintiff can use tolling doctrines to demonstrate that a suit over earlier acts is timely. As a practical matter, the plaintiff can use tolling doctrines to extend the actionable period so that it reaches further back in time.

Under Delaware law, inquiry notice universally limits tolling doctrines. A plaintiff cannot invoke tolling doctrines to push the timeliness period beyond the point when the plaintiff "was objectively aware, or should have been aware, of facts giving rise to the wrong." *Tyson Foods*, 919 A.2d at 585. "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled." *Id.* Once the plaintiff is aware of the injury, or should have discovered it in the exercise of

73

reasonable diligence, then the period for bringing a claim starts to run. *See Dean Witter*, 1998 WL 442456, at \*6. Once a plaintiff knows or should have known about a claim, tolling ends.

Under a discrete act system, inquiry notice terminates tolling and requires that a plaintiff pursue the action within a reasonable time. Under a continuing wrong system where the wrongful conduct remains ongoing, inquiry notice does not matter, because the continuing nature of the conduct means that the claim has not yet accrued for purposes of the running of the statute. Under a continuing wrong system where the wrongful conduct has stopped and a plaintiff has invoked a tolling doctrine to save an otherwise untimely lawsuit, inquiry notice operates the same way as in a discrete act system and may prevent the plaintiff from relying on the tolling doctrine to make the claim timely.

Under a separate accrual system, inquiry notice has two effects. If the ongoing conduct has stopped and a plaintiff has invoked a tolling doctrine to save an otherwise untimely lawsuit, inquiry notice operates the same way as in a discrete act system and may prevent the plaintiff from relying on a tolling doctrine to make the claim timely. If the plaintiff has sought to use a tolling doctrine to extend the actionable period and to show that a suit over earlier acts is timely, then inquiry notice may cut off the ability of the plaintiff to extend the actionable period. But the claim is not foreclosed entirely, because the plaintiff can still pursue claims that fall within the non-extended actionable period.

For example, assume that at Time Zero, the defendants implement an illegal business plan that prioritizes profit over compliance, giving rise to a *Massey* Claim. The defendants continue to pursue the business plan for ten years, at which point they adopt a

74

different business plan. If a plaintiff sues on January 1 of Year 10 and the presumptive limitations period is three years, then the plaintiff can sue for the breaches of the duty of loyalty that occurred in Years 7, 8, and 9.



If the plaintiff spent a year diligently pursuing books and records before filing suit, then the actionable period extends to Year 6.



If the plaintiff successfully alleges that the defendants fraudulently concealed the wrongful business strategy at all times, then the actionable period extends back to Time Zero.



But if the plaintiff was put on inquiry notice in Year 3, then the plaintiff had an obligation to sue within a reasonable time over the wrongs covered by the inquiry notice. Any claims based on conduct in Years 1, 2, or 3 would be untimely, and the limitations period on the ongoing conduct after that point would continue to run. If the plaintiff sued in Year 10, then the plaintiff could still sue for the separately accrued breaches of the duty of loyalty that occurred in Years 7, 8, and 9. But the plaintiff could not reach back further by relying on fraudulent concealment or a similar tolling doctrine that is negated by inquiry notice.



In this case, the plaintiffs invoke fraudulent concealment and equitable tolling. Neither provides a basis for expanding the actionable period.[23]

---

[23] The defendants initially seek to dispense with tolling doctrines with an argument about pleading. They assert that "[p]laintiffs make no allegations regarding tolling," and "[t]herefore, for this reason alone, tolling is unavailable." Dkt. 17 at 42. A complaint does not have to include a separate section titled "equitable tolling" or "tolling by fraudulent concealment." All that a plaintiff must do is plead facts that support a reasonable inference that tolling applies.

### a.    Fraudulent Concealment

The doctrine of fraudulent concealment tolls the statute of limitations and extends the time for suit under the doctrine of laches "when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth." *Tyson Foods*, 919 A.2d at 585. Tolling ends when the plaintiff is placed on inquiry notice, in the sense that the plaintiff knew or should have known about the wrongful act.[24]

"Fraudulent concealment requires that something affirmative be done by a defendant, some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry." *Ewing*, 520 A.2d at 667. Ignorance alone does not toll the statute. *Id.*; *Halpern*, 313 A.2d at 143. "The affirmative act requirement distinguishes fraudulent concealment from the doctrine of inherently unknowable injuries."[25]

---

[24] *See Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973) ("Where there has been fraudulent concealment from a plaintiff, the statute is suspended only until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence."). Outside of Delaware, some authorities take the view that when a defendant has taken affirmative steps to conceal wrongdoing, the defendant has committed an intentional tort. The limitations period therefore does not begin to run until the plaintiff actually discovers—not should have discovered—the wrongful act. *See Davenport v. A.C. Davenport & Son Co.*, 903 F.2d 1139 (7th Cir. 1990), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1389 (7th Cir. 1990).

[25] 2 Wolfe & Pittenger, *supra*, § 15.07[e][3] at 15-91. "Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical *impossibility*." *Dean Witter*, 1998 WL 442456, at *5 (emphasis added); *accord Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004) ("Ignorance of the cause of action will not toll the statute . . . unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."). "For the limitations period to

"The rationale for this doctrine is to disallow a defendant from taking advantage of his own wrong in preventing a plaintiff from a timely suit in the courts." *Allen v. Layton*, 235 A.2d 261, 265 (Del. Super. Ct. 1967), *aff'd*, 246 A.2d 794 (Del. 1968).

> [I]f one by fraud conceals the fact of a right of action, it is not ingrafting an exception on the statute to say that he is not protected thereby, but it is simply saying that he never was within the statute. since its protection was never designed for such as he. By fraud he has put himself outside of its pale. Whether this be taken as an exception, or only a limitation of the statute, it rests upon sound reason and just policy.

*Lieberman v. First Nat'l Bank of Wilm.*, 45 A. 901, 903 (Del. 1900).

When a plaintiff relies on fraudulent concealment, the plaintiff must plead the circumstances supporting the doctrine with particularity sufficient to advise the defendant of the basis for the claim. Ct. Ch. R. 9(b); *Halpern*, 313 A.2d at 143. Simply alleging that a defendant engaged in fraudulent concealment is insufficient. As with an affirmative claim for fraud, once the plaintiff pleads facts with the requisite particularity, the plaintiff is

---

be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury." *Dean Witter*, 1998 WL 442456, at *5. "Often, plaintiffs can establish 'blameless ignorance' by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception." *Id.* "This doctrine tolls the limitations period until a plaintiff had 'reason to know' that a wrong has been committed." *Id.* The tolling doctrine that recognizes a plaintiff's ability to rely in good faith on a professional operates similarly to the concept of equitable tolling, discussed below. For a recent decision applying this tolling doctrine to a trustee, *see Hillblom v. Wilmington Trust Co.*, C.A. No. 2021-1034-MTZ, slip op. at 29-34 (Del. Ch. Dec. 6, 2022). Directors are quasi-trustees for the corporation and its stockholders. *Schoon v. Smith*, 953 A.2d 196, 206 (Del. 2008); *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939). The reliance-on-professionals doctrine thus offers a source of insight into how tolling should operate against corporate fiduciaries.

entitled to the benefit of the reasonable inferences that can be drawn from those facts. *See, e.g., Am. Int'l Gp.*, 965 A.2d at 805–06 ("But, even though fraud must be stated with particularity, this is still a motion to dismiss, and the Stockholder Plaintiffs are entitled to have me draw all reasonable inferences in their favor.").

To assert fraudulent concealment as a tolling doctrine, a plaintiff requires facts supporting an inference of *scienter* such that the defendant "had actual knowledge of the wrong done and acted affirmatively in concealing the facts."[26] Delaware decisions have not clearly stated whether a plaintiff must plead reliance and causation to invoke tolling by fraudulent concealment. One Delaware case asserts that "a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." *Tyson Foods*, 919 A.2d at 585. By using the verbs "prevented" and "led . . . away," the decision implies the need for reliance by the plaintiff and causation by the defendant, and one decision has cited *Tyson Foods* with a parenthetical that describes the case as requiring that a plaintiff plead reliance to support tolling. *See Akrout v. Jarkoy*, 2018 WL 3361401, at *10 n.80 (Del. Ch. July 10, 2018). Other statements of what a plaintiff must show to plead fraudulent concealment do not require causation or reliance. *See, e.g., Lecates v. Hertrich Pontiac*

---

[26] *Ewing*, 520 A.2d at 667; *accord Shockley v. Dyer*, 456 A.2d 798, 799 (Del. 1983) ("In order for the doctrine of fraudulent concealment to be applicable [to toll the statute of limitations], the [alleged wrongdoer] must have had actual knowledge of the wrong done and affirmatively acted in concealing the facts from the patient."); *Tilden v. Anstreicher*, 367 A.2d 632, 634 (Del. 1976) ("The doctrine of fraudulent concealment requires both knowledge and affirmative action on the part of the [wrongdoer].").

*Buick Co.*, 515 A.2d 163, 176 (Del. Super. Ct. 1986) ("[A] claim of fraudulent concealment requires the twin showing of (a) the defendant's knowledge of the alleged wrong, and (b) an affirmative act of concealment by the defendant."). *See generally* 51 Am. Jur. 2d *Limitation of Actions* § 166, Westlaw (database updated Nov. 2022) ("According to some authority, reliance is not an element of fraudulent concealment, as is relevant to the tolling of a statute of limitations; rather, all that is required is a showing of an underlying wrong and that the defendant actually knew the plaintiff was in fact wronged and concealed that fact to deceive the plaintiff.").

The plaintiffs offer little to support fraudulent concealment. They argue that "[m]ultiple lawsuits describe [AmerisourceBergen's] attempts to hide its Board sanctioned practice of prioritizing profits over safety." Dkt. 28 at 70 (citing Compl. ¶ 119). Paragraph 119 describes a board meeting in March 2012 at which the board approved management's plan to expand AmerisourceBergen's market share by targeting independent pharmacies. The paragraph does not contain any references about AmerisourceBergen hiding information. There are other paragraphs in the complaint that make generalized references to lawsuits containing descriptions of AmerisourceBergen's attempts to hide its wrongdoing, but that is insufficient to support an inference of fraudulent concealment. Perhaps those other complaints contain specific allegations about concealment. The court does not have the other complaints, and the plaintiffs' complaint does not contain the requisite specific allegations.

The plaintiffs add that "[AmerisourceBergen] falsely assured the public that it was undertaking efforts to comply with its legal obligations and prevented discovery of

80

statistical data and other information showing the extent of [AmerisourceBergen's] unlawful activities." Dkt. 28 at 70 (citing Compl. ¶¶ 252 & 255). Paragraph 252 alleges that in a complaint that the Cherokee Nation filed against AmerisourceBergen and other major opioid distributors and pharmacies in February 2018, the Cherokee Nation

> alleged AmerisourceBergen made affirmative efforts to conceal its conduct and avoid detection, including by falsely assuring the public, through trade associations or otherwise, that AmerisourceBergen was undertaking efforts to comply with its legal obligations as well as by preventing discovery of statistical data and other information showing the extent of AmerisourceBergen's unlawful activities and its impact on the Cherokee Nation.

Compl. ¶ 252. That may be so, but that summary of what the Cherokee Nation alleged is no substitute for the plaintiffs alleging facts supporting an inference that AmerisourceBergen engaged in specific acts designed to fraudulently conceal its actions from them, nor have they explained when the fraudulent acts took place so that the court could consider whether to apply a tolling doctrine. The complaint alleges that the United States District Court for the Eastern District of Oklahoma denied the defendants' motion to dismiss, but the plaintiffs do not reference any ruling on fraudulent concealment or tolling (which the decision does not appear to contain). *See Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225 (E.D. Okla. 2021).

Paragraph 255 also references a complaint that the Attorney General of the State of Georgia filed against AmerisourceBergen and other major opioid distributors and manufacturers in January 2019. The plaintiffs describe the Georgia complaint as alleging that "AmerisourceBergen, among others, made fraudulent misrepresentations, suppressions, and concealments of material facts in order to fraudulently conceal the

81

existence of causes of action against them." Compl. ¶ 255. The plaintiffs have not identified any factual allegations to support this conclusory characterization. Once again, they have not identified specific acts that AmerisourceBergen took to fraudulently conceal the existence of causes of action, nor have they explained when the fraudulent acts took place so that the court could consider whether to apply a tolling doctrine based on those acts.

The plaintiffs fare better with their allegations about disclosures that appeared in AmerisourceBergen's annual reports on Form 10-K starting with the fiscal year ending September 30, 2017. There, AmerisourceBergen represented to stockholders that its anti-diversion controls were sound, stating:

> [W]e are deeply committed to diversion control efforts, have sophisticated systems in place to identify orders placed warranting further review to determine if they are suspicious (including through the use of data analytics), and engage in significant due diligence and ongoing monitoring of customers.

*Id.* ¶ 295. Similar disclosures appear in the Form 10-Ks for subsequent years.

The plaintiffs have alleged particularized facts which support an inference that the disclosure in the Form 10-K for September 30, 2017, was false, which makes that disclosure an actual artifice that would be sufficient to invoke fraudulent concealment for the purpose of extending the actionable period to that date. But that has no effect on the actionable period for purposes of this litigation, because the plaintiffs' diligent use of Section 220 already results in the actionable period extending back to October 20, 2016.

### b. Equitable Tolling

"[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." *Tyson Foods*,

919 A.2d at 585. "The obvious purpose of the equitable tolling doctrine is to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing." *Am. Int'l Gp.*, 965 A.2d at 813; *see also Hillblom v. Wilm. Tr. Co.*, C.A. No. 2021-1034-MTZ (Del. Ch. Dec. 6, 2022) (tolling statute of limitations for breach of fiduciary duties and trust; finding plaintiff's injury was inherently unknowable when the plaintiff had no reason to believe she should investigate professional trust's conduct).

In *Seaboard*, Chancellor Allen engaged in a lengthy and scholarly discussion of the tolling principle under which a stockholder is entitled to rely on the good faith of directors such that a claim for breach of fiduciary duty would not arise until the stockholder had actual knowledge of the wrong or was placed on inquiry notice. Chancellor Allen explained that "[g]iven the fiduciary duties that the law imposes upon the relationship among those serving as corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes." 625 A.2d at 275. He stressed that "[s]ince trust and good faith are the essence of this relationship, it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitations woodenly or automatically to alleged self-interested violations of trust." *Id.* He concluded that reasonable reliance upon the competence and good faith of others who have assumed legal responsibilities towards a plaintiff was sufficient to toll the running of an applicable statute of limitations. *Id.*

The *Seaboard* case involved a self-dealing contract between a corporation and its controlling stockholder, and in his discussion of the precedents and their application to the

facts before him, Chancellor Allen frequently referred to the tolling principle applying in cases of self-dealing. *Id.* at 275–77. In discussing several early precedents, however, he noted that the rule extended to the type of fraud perpetrated by a fiduciary, or as he stated in describing one case, "fraud perpetuated by one who, because he has legal power over the property of others, has fiduciary obligations to those others." *Id.* at 276. During the era that generated the precedents that Chancellor Allen reviewed, "fraud" was used when referring to fiduciary misconduct not in the sense of common law fraud, or even to equitable fraud as we now conceive of it, but in the general sense of constructive fraud as a synonym for breach of fiduciary duty.[27]

When this court next applied *Seaboard*, the court converted the specific application to a general rule. *See Litman v. Prudential-Bache Props., Inc.*, 1994 WL 30529, at *3 (Del. Ch. Jan. 14, 1994), *aff'd*, 642 A.2d 837 (Del. 1994) (TABLE). Based on the repeated references to self-dealing in *Seaboard*, the *Litman* court reasoned that the fiduciary tolling principle—which the court described as equitable tolling—only applied to cases involving

---

[27] *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1236–37 (Del. Ch. 2001) ("Our corporate case law has thrown [the so-called 'constructive fraud'] concept around in a not particularly precise way, but always in a context in which the court is examining whether directors have complied with their fiduciary duties."), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002). *See generally* Dan B. Dobbs, *Handbook on the Law of Remedies* 679–85 (1973) (criticizing the use of the term "constructive fraud" and explaining its function as a tool for enforcing fiduciary relationships); 3 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* 625–26, 788–92 (5th ed. 1941) (explaining concept of constructive fraud, including its application to situations involving fiduciary breach); 2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 307, at 309 (13th ed. 1886) (explaining that courts used the concept of "constructive fraud" to describe breaches of fiduciary duty).

self-dealing in the sense of fiduciaries extracting benefits for themselves. *Id.* The decision did not cite any authority for this reformulation. The court simply stated, "I think the better rule, and the one Chancellor Allen intended, is that a limitations period may be tolled absent allegations of affirmative acts of concealment by the defendants, where the parties to the litigation stand in a fiduciary relationship to each other and where the plaintiff alleges self-dealing." *Id.* Under this view, "[i]n situations that do not involve self-dealing, equitable tolling operates in much the same way as the doctrine of fraudulent concealment." *Id.* Because the allegations in *Litman* did not involve the extraction of personal benefits, the case did not involve self-dealing, and the court did not toll the statute. *Id.* Subsequent decisions have used the *Litman* framing. *See Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008); *Dean Witter*, 1998 WL 442456, at \*6.

The limitation of equitable tolling to one subspecies of loyalty violation—self-dealing—does not make sense to me. Loyalty and its subsidiary element of good faith constitute the core fiduciary principle. If fiduciaries act disloyally or in bad faith, but without engaging in self-dealing, it seems to me that equitable tolling should apply.[28]

The application of equitable tolling in *Weiss* supports the broader formulation. There, the court considered a challenge to grants of spring-loaded and bullet-dodged

---

[28] As discussed in a previous footnote, the doctrine of equitable tolling with its concept of reliance on fiduciaries bears a strong resemblance to the doctrine of blameless ignorance and the role it affords to reliance on professionals. The latter is not artificially limited to self-dealing. *See Hillblom v. Wilmington Trust Co.*, C.A. No. 2021-1034-MTZ, slip op. at 29-34 (applying tolling doctrine to multiple claims not involving classic self-dealing).

options that the defendant fiduciaries had made not only to themselves but also to executives. 948 A.2d at 451. There had never been any disclosure about this practice, and the court held that the doctrine of equitable tolling applied not only to the self-interested grants, but also to the grants to the executives. *Id.* The latter grants were inferably disloyal because the complaint supported an inference that the directors had knowingly violated limitations in the governing plan documents and under applicable law, but they did not constitute self-dealing in the sense mandated by *Litman*. *Id.*; *accord Tyson Foods*, 919 A.2d at 590–91 (same).

More to the point, while serving as a Vice Chancellor, Chief Justice Strine rejected an argument that equitable tolling "only applies to cases of pure self-dealing." *Am. Int'l. Gp.*, 965 A.2d at 812. The plaintiff in that case alleged that an officer had taken steps to fraudulently inflate a corporation's balance sheet. Chief Justice Strine reasoned that "[t]o allow fiduciaries who engaged in illegal conduct to wield a limitations defense against stockholders who relied in good faith on those fiduciaries when their disclosures provided no fair inquiry notice of claims would be inequitable." *Id.* Under the reasoning of that case, equitable tolling extends to breaches of the duty of loyalty that rest on illegality.

A *Massey* Claim involves a breach of the duty of loyalty that rests on illegality. Equitable tolling is therefore available for a *Massey* Claim, even without allegations of pure self-dealing. A Red-Flags Theory requires conscious wrongdoing that amounts to bad faith. Equitable tolling is available for that species of claim as well.

For the *Massey* Claim, equitable tolling theoretically could enable the plaintiffs to extend the actionable period back to 2010, when they contend that AmerisourceBergen

management and the directors first took steps to pursue a business plan that prioritized profits over legal compliance by embarking on the Independent Pharmacy Strategy. For the Red-Flags Claim, equitable tolling could enable the plaintiffs to extend the actionable period back to 2012, when the investigations and lawsuits began. The question then becomes whether the plaintiffs were placed on inquiry notice before the actionable period.

The defendants point to facts that the plaintiffs have alleged in their complaint about AmerisourceBergen's initial difficulties with the DEA and anti-diversion programs in 2007, including the settlement with the DEA over AmerisourceBergen's Orlando distribution center and the consent judgment between the DEA and AmerisourceBergen's Bellco subsidiary. The plaintiffs have pled those facts to support an inference that the directors knew about the need for anti-diversion controls and the risks inherent in not having a strong anti-diversion program. The plaintiffs are not citing those facts as actionable conduct. To the contrary, the plaintiffs acknowledge that after these events, AmerisourceBergen developed what at the time constituted the industry-standard anti-diversion program.

Between 2010 and 2015, however, problems began to emerge at the Company. The quarterly report on Form 10-Q for the quarter ending December 31, 2012, disclosed that the Company had received a subpoena from the United States Attorney's Office for the District of New Jersey and that the Company had been sued by the Attorney General of West Virginia. The Form 10-K for the fiscal year ending September 30, 2013, disclosed a series of legal matters, including a complaint filed by the Attorney General of West Virginia, the subpoenas issued by the United States Attorney for the District of New Jersey,

87

and additional subpoenas issued by the United States Attorneys for the Districts of Kansas and the Northern District of Ohio. During 2014, the Company's public filings continued to contain disclosures about the investigations being conducted by the United States Attorneys' Offices and the lawsuit by the Attorney General of West Virginia.

A reasonable stockholder seeing those disclosures would be concerned about what was happening at the Company. Evidencing that reality, a law firm that is both a fast and frequent flier of derivative actions sent a books-and-records demand to the Company in December 2014 to investigate potential wrongdoing. After obtaining an agreed-upon production of documents, the law firm sent a litigation demand in December 2015, which asked the directors to bring claims against themselves and the management team for breaches of fiduciary duty in connection with their failure to oversee the Company's diversion control and order monitoring systems. Ex. 55. As support for an inference of wrongdoing, the demand cited:

- The DEA's 2007 suspension of the Company's license for the Orlando distribution center.

- The Company's public disclosures about receiving subpoenas from various U.S. Attorneys' Offices.

- A complaint filed by the Attorney General of West Virginia, as well as complaints filed by the Attorneys General of Boone County, West Virginia, and Fulton County, Georgia.

*Id.* at 3–4. The demand also cited the Company's low rate of suspicious order reporting for 2012, which was obtained from documents produced in the books-and-records investigation. *Id.* at 4.

88

Even accepting that the law firm was engaged in a hypervigilant search for a lawsuit and wanted to get out ahead of other entrepreneurial firms, the demand supports an inference that stockholders were on inquiry notice about problems at AmerisourceBergen as early as December 2015. Under a discrete act accrual system, the existence of inquiry notice at that point would make any lawsuit untimely that was not filed within a reasonable time after December 2015. From that point on, the defendants would be able to continue their actions without any prospect for accountability through a derivative action for breach of fiduciary duty.

Under the separate accrual system, inquiry notice does not have that effect. It prevents the plaintiff from relying on tolling doctrines to extend the actionable period, but it does not prevent a plaintiff from suing for the portion of the ongoing wrongful acts and the resulting damages that occurred during the actionable period. Nor does it prevent the actionable period from including additional time on the basis of when the plaintiffs began pursuing their claims by seeking books and records. Here, the plaintiffs can sue for wrongs dating back to October 20, 2016, and can recover damages that the Company suffered during that period.

## C.     The Issue Of Prejudice

The second dimension of the laches analysis is prejudice to the defendants. "Laches is fundamentally concerned with the prevention of inequity in permitting a claim to be enforced. Inequity for this purpose arises where there occurs some change in the condition or relation of the parties or the property involved in the pending lawsuit." Wolfe & Pittenger, *supra*, § 15.07[c][4] at 15-18. The time period that a court determines is

89

presumptively permissible may require modification if the defendant can show that a plaintiff failed to act as expeditiously as the circumstances dictated and suffered actual prejudice as a result. *Id.*

The defendants have not pointed to any prejudice that could render the plaintiffs' suit untimely. They made a straightforward statute of limitations argument, which this decision has rejected. There are no indications that evidence has been lost. There is no reason to think that the defendants have suffered any other disadvantage in their ability to litigate the case.

If anything, now is the appropriate time to litigate the case. With the 2021 Settlement concluded, the bulk of the harm to the Company has been quantified, and the time has come to consider whether grounds exist to shift responsibility for the harm that the Company has suffered to the individuals who made decisions on its behalf.

## D.    Other Equitable Considerations

When conducting a laches analysis, a court may take into account "unusual conditions or extraordinary circumstances."[29] This decision has conducted an extensive

---

[29] *Levey,* 76 A.3d at 770; *accord IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 178 (Del. 2011) (same); *Wright v. Scotton*, 121 A. 69, 73 (Del. 1923) ("[I]f unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute" then a court may "determine the extraordinary case in accordance with the equities which condition it."). There is a case that sought to interpret laches as a one-way ratchet that could shorten the otherwise applicable limitations period but which could not lengthen it beyond what a recognized tolling doctrine would allow. *See, e.g.*, *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at \*4 (Del. Ch. Sept. 27, 2013) ("[L]aches may bar a plaintiff in equity before the analogous statute of limitations has run, but a filing after the analogous statute of limitations has run cannot be justified except in the rare and unusual circumstance that

analysis to determine an actionable period for the plaintiffs' suit. There are no other equitable reasons to enlarge or shorten the period.

## E.     The Plaintiffs' Claims Are Timely.

In their final argument, the defendants contend that the plaintiffs' claims are untimely because no actionable conduct took place within the limitations period. Based on the laches analysis that this decision has conducted, the plaintiffs' claims are timely.

The factual background describes a litany of events that took place after October 20, 2016, which constitute red flags for purposes of the Red-Flags Theory. The factual background likewise explains that the defendants did not take action to address the Revised

---

a recognized tolling doctrine excuses the late filing. In other words, a plaintiff in equity cannot file beyond the statute of limitations unless a tolling doctrine exists that would justify an equally late filing in a court of law." (cleaned up)). Delaware Supreme Court decisions do not embrace this view, with the high court holding instead that "[a] statute of limitations period at law does not automatically bar an action in equity because actions in equity are time-barred only by the equitable doctrine of laches." *Whittington*, 991 A.2d at 9. In *Levey* and *O'Brien*, the high court reversed decisions by this court that applied laches in a manner coterminous with the statute of limitations and applicable tolling doctrines, holding instead that a court of equity could permit the claim to proceed even though a recognized tolling doctrine did not apply. *See Levey*, 76 A.3d at 769; *O'Brien*, 26 A.3d at 176. In this setting, the high court has upheld equity's traditional ability to address injustice on a case-by-case basis and ameliorate the potentially harsh effects of a generally sound rule of law. *See In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *4 (Del. Ch. Oct. 17, 2007) ("Courts of Equity came into being because universally applicable legal rules are bound to work injustice in certain individual cases. [Accordingly,] it would be antithetical for a court of equity to blindly apply a statute of limitations to bar equitable claims."), *aff'd sub nom. Int'l Bhd. Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008); *see also XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 630–640 (Del. Ch. Sept. 19, 2022) (discussing the history of the law-equity divide).

OMP or institute a system of direct board oversight until the 2021 Settlement, which is sufficient for the *Massey* Theory.

This decision does not address the defendants' contention that demand is futile because the plaintiffs' theories do not pose a substantial threat of liability to at least half of the directors in office when suit was filed. This decision assumes for purposes of the timeliness analysis that the plaintiffs have viable claims and only considers whether the plaintiffs pursued them too late. Because the conduct that the plaintiffs challenged continued and intensified during the actionable period, the plaintiffs' claims are timely.

## III. CONCLUSION

The defendants' motion to dismiss the plaintiffs' claims as untimely is denied.